## FORBES v. FIRST NAT. BANK OF ENID.

### No. 1934, Okla. T.   Opinion. Filed May 15, 1908.

### (95 Pac. 785.)

1.   **BILLS AND NOTES—Bona Fide Holder—Defense of Fraud— Duty of Inquiry.** In an action on a negotiable draft by the holder thereof who acquired it for value before maturity without notice against an indorser from whom the draft was obtained by fraud, knowledge of such facts as would put a prudent man upon inquiry in reference to the draft is not sufficient to defeat the right of the holder to recover, and the court may direct a verdict in favor of the holder, when the circumstances surrounding the transaction are not sufficiently strong for it to be said as a matter of law that bad faith may be reasonably inferred therefrom.

2.   **SAME—Usual Transaction—Scope of Authority.** A person who was held out by a bank as assistant cashier while in the control and management of the bank, in the absence of the cashier from the state, transferred to a second bank a negotiable draft in part payment of the balance due the second bank by his bank on the day's clearing. **Held,** that the second bank thereby obtained sufficient title to the draft to maintain an action thereon against an indorser who transferred the draft to the first bank.

(Syllabus by the Court.)

*Error from District Court, Garfield County; B. F. Burwell, Judge.*

Action by the First National Bank of Enid against J. E. Forbes upon a draft.   Judgment for plaintiff, and defendant brings error.   Affirmed.

This is an action brought by the First National Bank of Enid, Okla., against the Fourth National Bank of Dayton, Ohio, Citizens' Bank of Enid, Emily Smith, J. E. Forbes, and R. L. Denton, receiver of the Citizens' Bank, upon a draft drawn by the Fourth National Bank of Dayton on the Hanover National Bank of New York for the sum of $700 and indorsed by Emily Smith, Citizens' Bank of Enid, and J. E. Forbes.   It does not appear that any service was had upon the Citizens' Bank of Enid, or upon Emily Smith, and no appearance is made for them

so far as the record discloses. The case was tried before a jury, and, after evidence was introduced by both parties, the court sustained a motion of plaintiff to direct the jury to return a verdict for it. For convenience the First National Bank of Enid will hereafter be referred to as the plaintiff, or as the First National Bank, and the Citizens' Bank of Enid as the Citizens' Bank.

On the 4th day of April, 1904, the Fourth National Bank of Dayton, Ohio, made a draft for $700 on the Hanover National Bank of New York, payable to the order of Emily Smith. This draft was brought to Enid, Okla., and on the 19th day of April, 1904, Emily Smith indorsed it in blank, and delivered it to J. E. Forbes in payment for certain real estate purchased from him on that day. About 4:15 o'clock p. m. of that day Forbes deposited the draft in the Citizens' Bank, and received credit on his pass book for the amount thereof. The Citizens' Bank was at that time a banking corporation organized under the laws of the territory of Oklahoma, doing business at the city of Enid, Okla. H. H. Watkins was its cashier, Wm. Kennedy, its president, and W. T. Dugan, its assistant cashier, but the evidence does not disclose that Dugan was a stockholder in the bank. On the 19th day of April, 1904, as agreed by the parties to this action, the Citizens' Bank was insolvent. Watkins, the cashier of the bank, on that day had gone to Kansas City for the purpose of securing financial aid to tide him over the difficulties then surrounding the institution. In his absence, the affairs of the bank were carried on by Dugan as assistant cashier. At that time the First National Bank was engaged in the banking business, with S. T. Goltry as its president. On the 19th day of April, 1904, at about the hour of 1:30 p. m., there was a clearance had between the Citizens' Bank and the First National Bank, which showed a balance in favor of the latter in the sum of $4,400. For the purpose of paying this balance, the Citizens' Bank issued to the First National Bank its draft on the City National Bank of Kansas City for that sum, and the draft was delivered to the First National Bank at the time of the clearance. Dugan, the assistant

cashier of the Citizens' Bank, requested that the draft should not be forwarded for collection until he should see the First National Bank again, stating that he was expecting a telegram from Kansas City which might inform him that the account of the Citizens' Bank had been changed from the City National Bank of Kansas City. About 4:45 p. m. of that day, Dugan not having given the First National Bank any further information relative to the draft for $4,400, Goltry, president of the First National Bank, took the draft to the Citizens' Bank and inquired of him whether he had heard from Kansas City, and whether the First National Bank should remit the draft, and, on being informed that he had not heard from Kansas City, Goltry asked that the Citizens' Bank make some other arrangement for settlement of the balance due the First National Bank on the day's clearing. Dugan delivered to Goltry in payment of said balance all the checks and drafts the Citizens' Bank had received that day, amounting to the sum of $3,200. The items delivered by him to Goltry included the draft involved in this action. To secure the remainder of the $4,400, Goltry took some form of duebill or cashier's check, signed by Dugan, as assistant cashier, and took as collateral a United States bond for the sum of $500, and a note for $1,000 executed by the Enid Wholesale Grocery Company in favor of the Citizens' Bank. Goltry then returned the draft on the bank in Kansas City. This transaction occurred on Tuesday. On Saturday prior thereto a draft was issued by the Citizens' Bank for the sum of $1,800 in favor of the First National Bank, which was forwarded by the First National Bank to its correspondent in Kansas City. On the Monday following, being the 18th day of April, 1904, this draft was presented for payment, which was refused, and the draft went into the hands of a notary public for the purpose of being protested. Of this fact Goltry, the president of the First National Bank, was notified by wire, but later on the same day the draft was taken from the hands of the notary public and was paid. After receiving the telegram on Monday to the effect that his draft had been placed in the hands of a notary public for

protest, Goltry called upon Watkins, cashier of the Citizens' Bank, and offered his assistance to tide the Citizens' Bank over its financial embarrassment, but was assured by Watkins that the assistance was not needed. Some time during the night of April 19th, or on the morning of the 20th, the assistant cashier of the Citizens' Bank notified the bank commissioner of the condition of the bank, and on the morning of the 20th the bank went into the hands of the bank commissioner. Early on the morning of the 20th day of April Forbes learned of the failure of the Citizens' Bank, and stopped payment of the $700 draft sued on in this action.

Upon the verdict of the jury directed by the court, judgment was rendered in favor of plaintiff against the Citizens' Bank, its receiver, and J. E. Forbes. The case is brought to this court on appeal by J. E. Forbes.

*Manatt & Sturgis,* for plaintiff in error.
*Charles West* and *Winfield Scott,* for defendant in error.

HAYES, J. (after stating the facts as above). It is admitted that the Citizens' Bank was insolvent at the time it obtained the draft from Forbes. There is evidence sufficient to go to the jury to the effect that the officers of the bank knew it was insolvent at that time, and that the president of the First National Bank had knowledge at the time it obtained the draft from the Citizens' Bank that the Citizens' Bank was in a failing condition, and that it had knowledge that the Citizens' Bank had acquired the draft on the same day the draft was transferred to it by Dugan, but there is no evidence that the president of the First National Bank or any other officer of the bank had any knowledge of how the Citizens' Bank had acquired the draft from Forbes, or that it had acquired it from Forbes.

The draft in question is a negotiable instrument in the strictest sense. It was acquired by the First National Bank for value before maturity. It was accepted by the First National Bank in

part payment of the balance due it by the Citizens' Bank on the clearance of that day. The doctrine that the receiving of a negotiable instrument in payment of or as security for a pre-existing debt is receiving it for a valuable consideration is supported by the weight of authorities of both the state and federal courts of the Union. *Swift v. Tyson,* 16 Pet. (U. S.) 1, 10 L. Ed. 865; Norton on Bills and Notes, 294; 1 Daniel on Negotiable Instruments, par. 184; *Winfield National Bank v. McWilliams,* 9 Okla. 493, 60 Pac. 229.

Plaintiff's possession of the draft, indorsed by the payee in Blank, was *prima facie* evidence that it acquired the same in good faith for value in the usual course of business before maturity, but, when Forbes introduced evidence tending to show that the draft had been obtained from him by the Citizens' Bank at a time when it was insolvent and the officers thereof knew it was insolvent, established such fraud in the Citizens' Bank's obtaining said draft from Forbes that the burden of proof then shifted to the First National Bank to show it had acquired the draft in good faith for value in the usual course of business. However, if plaintiff thereafter established that it received the draft for value in the usual course of business, and under circumstances that did not operate as constructive notice of the fraud by which Forbes had been induced to part with it, then the burden of proof was upon Forbes to prove actual notice of fraud. 1 Daniel on Negotiable Instruments, 812, 815, 819; *Winfield National Bank v. McWilliams, supra.*

There was no proof that plaintiff had actual notice of fraud practiced upon Forbes by the Citizens' Bank in acquiring said draft. The fact that the president of the First National Bank may have had knowledge that the Citizens' Bank was in a failing condition does not prove notice to it of the fraud of the Citizens' Bank in procuring the draft in question from Forbes. Plaintiff, by showing that it was a purchaser for value before maturity of said draft, established its right to recover thereon, unless such right be defeated by proof of notice of the equities of Forbes or of

its bad faith. In *Atlas National Bank v. Holm et al.*, 71 Fed. 489, 19 C. C. A. 94, the United States Circuit Court of Appeals of the Seventh Circuit said:

"There has been a contrariety of rulings on the subject, but the weight of authority has long been (in the federal courts, certainly since *Swift v. Tyson*, 16 Pet. [U. S.] 1, 10 L. Ed. 865) that one who takes an assignment of commercial paper before maturity, paying value, without notice of infirmity in the title or consideration, is deemed a good faith purchaser, and that, to deprive him of that character, it is not enough that he neglected to make the inquiry which under the circumstances a prudent man would or ought to have made."

It is contended by plaintiff in error that the conduct of Goltry in going to the Citizens' Bank after banking hours and obtaining the draft in question, and the other items of remittance which had been received by the Citizens' Bank during that day and the government bond and a note in settlement of the balance due by the Citizens' Bank to the First National Bank, when Goltry had knowledge that the Citizens' Bank was in a failing condition, and that it had acquired said draft on that day, establishes the bad faith of the plaintiff in taking the draft. He contends that the circumstances under which the draft was obtained were such as should have created a suspicion in the mind of Goltry, and put him upon inquiry, and that his not having made inquiry of the assistant cashier of the Citizens' Bank as to how he obtained the draft establishes the bad faith of the plaintiff. We think this contention not well founded, for it has become the well-established rule in the federal courts of the Union and in the greater number of state courts that suspicion of defect of title or even gross negligence on the part of a taker of a negotiable instrument will not defeat his title. *Atlas National Bank v. Holm et al., supra; Murray v. Lardner*, 2 Wall. (U. S.) 110, 17 L. Ed. 857; *Hotchkiss v. National Banks*, 21 Wall. (U. S.) 354, 22 L. Ed. 645; *Clark v. Evans et al.*, 66 Fed. 263, 13 C. C. A. 433; *Goodman v. Simonds*, 20 How. (U. S.) 343, 15 L. Ed. 934; 1 Daniel on Negotiable Instruments, 766.

In *Murray v. Lardner, supra,* Mr. Justice Swayne, speaking for the court, said:

"The possession of such paper carries the title with it to the holder: 'The possession and title are one and inseparable.' The party who takes it before due for a valuable consideration, without knowledge of any defect of title, and in good faith, holds it by a title valid against all the world. Suspicion of defect of title or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title. That result can be produced only by bad faith on his part. The burden of proof lies on the person who assails the right claimed by the party in possession. Such is the settled law of this court, and we feel no disposition to depart from it. The rule may perhaps be said to resolve itself into a question of honesty or dishonesty, for guilty knowledge and willful ignorance alike involve the re-result of bad faith."

In *Goodman v. Harvey,* 4 Ad. & El. 870, it was held that gross negligence might be evidence tending to show *mala fides* and as such admissible, but that it did not in itself amount to proof of *mala fides,* and was not sufficient to deprive the holder of his right to recover.

In *Hamilton v. Vought,* 34 N. J. Law, 187, it was held that, when *mala fides* is the point of inquiry, suspicious circumstances must be of substantial character, and, if such circumstances do not appear, the court can arrest the inquiry, and that the circumstances must be strong so that bad faith can be reasonably inferred. The court in that opinion used this language:

"To preserve the negotiability of commercial paper and guard the interest of trade, it is absolutely necessary that large power should be placed in the judicial hand when the question arises as to what facts are sufficient to defeat the claim of the holder of a note or bill which has been taken before maturity, and for which value has been paid. It is only in this mode that the requisite stability in transactions of this kind can be retained."

The circumstances that surround the transfer of the draft in this suit by the Citizens' Bank to the plaintiff tend to prove that

the plaintiff had knowledge of the failing condition of the bank, but these circumstances are not sufficient to fasten upon the plaintiff a strong suspicion that the draft in question had been fraudulently obtained. There are various ways by which this draft could have been acquired by the Citizens' Bank on the day of its failure and been obtained without fraud.· It could have been delivered to the bank in payment of an indebtedness. The bank could have paid cash for it. The bank could have given exchange on other banks for it. There was nothing in the face of the draft to indicate that Forbes had any interest therein. He had delivered the same to the bank as a negotiable instrument. It was within his power, if he had so desired, to have indorsed the same for collection and deposited it, and thereby have given notice to all into whose hands the draft should come that he had an interest in the same, but he did not do so. He placed it within the power of the Citizens' Bank to transfer it as a negotiable·instrument, and to treat it as its property. If one of two equally innocent persons must suffer from the wrong conduct of a third person, the one who places it within the power of the third person to commit the wrong should suffer. There is not the slightest evidence in the record that Goltry had any knowledge whatever of how the bank had obtained the·draft from Forbes, nor was there evidence to impute to him guilty knowledge of such facts or willful ignorance thereof. The fact that the evidence may show that Goltry had such knowledge as might have made him suspicious that the Citizens' Bank was in a failing condition, and that he acted diligently in an effort to collect the balance due by the Citizens' Bank to plaintiff, does not prove bad faith. This he had a right to do, and the evidence must show, in order to defeat a recovery, that the plaintiff bank knowingly participated in the perpetration of fraud upon Forbes by the Citizens' Bank, or that it did so in willful ignorance.

It was held by the Court of Appeals of New York, in *Magee v. Badger and Another*, 34 N. Y. 247, 9 Am. Dec. 691, that the duty or act of inquiry does not rest upon the purchaser of commercial paper to avert the imputation of bad faith. The rights of

the holder are to be determined by the simple test of honesty and good faith, and not by the issue as to his intelligence or ignorance.

*Bona fides* is defined in Norton on Bills and Notes, p. 306, in the following language:

" '*Bona fides*' or 'good faith' is a term used as a mere distinction from '*mala fides*,' or 'bad faith.' If paper be purchased without anything which the law can construe into notice, it is spoken of as being purchased in good faith. Where, on the contrary, the purchaser has what the law construes to be notice of defects or equities, then he is a purchaser in bad faith, and can secure to himself none of the advantages given to the *bona fide* purchaser; but bad faith means nothing more than participation in the fraud, and resolves itself into a question of honesty or dishonesty, for guilty knowledge and willful ignorance alike involve the result of bad faith."

Tiedeman on Bills and Notes, p. 256, in speaking of the two different rules that have prevailed in the courts upon what constitutes a *bona fide* holder, uses this language:

"But the great weight of authority in this country, as well as reason, supports the contrary doctrine, that the *bona fide* character of a holder can be destroyed only by proof of participation in or actual knowledge of the fraudulent or illegal character of the instrument."

It is contended by plaintiff in error that by his introducing evidence that the possession of the note by the Citizens' Bank had been obtained from him by fraud, thereby shifting the burden to the plaintiff to show that he was a *bona fide* holder for value, the court was precluded from instructing the jury to return a verdict in favor of plaintiff. We cannot agree with this contention of plaintiff in error. It is true that, when the maker or endorser of a negotiable instrument establishes that the execution or transfer of the same was procured by fraud, he *prima facie* establishes a defense until overcome by evidence of the holder of the instrument that he is a purchaser for value before maturity in good faith, and, upon his doing so, the burden of proving notice of the fraud

is then shifted to the defendant.   There being no testimony in this case that the First National Bank had notice of the fraud practiced by the Citizens' Bank upon the defendant, Forbes, in the procuring of the draft in controversy, and it having been established that the First National Bank paid· full value for the draft before maturity, defendant's defense is reduced to one of bad faith, on the part of the First National Bank, and, since the evidence introduced does not establish bad faith, it was within the power of the court to direct a verdict.

"The question is one simply of good faith in the purchaser; and, unless the evidence makes out a case upon which the jury would be authorized to find fraud or bad faith in the purchaser, it is the duty of the court to direct a verdict for the holder."   (Norton on Bills and Notes, 303.)

It is further contended by the plaintiff in error that the First National Bank obtained no title in the draft in controversy, for the reason that Dugan, the assistant cashier, by whom it was transferred to the plaintiff, had no authority to transfer the same to it.   The evidence is that Dugan was assistant cashier of the bank; that on the 19th day of April, 1904, when the transaction between the Citizens' Bank and the First National Bank took place, he was in active management and control of the bank as assistant cashier, in the absence of the cashier from the territory.

*Smith v. Lawson et al.,* 18 W. Va. 212, 41 Am. Rep. 688, has been cited by plaintiff in error as decisive of the contention he urges.   The facts in that case were that in the year 1866 Anthony Lawson drew a note payable to the order of James A. Nighbert, which was indorsed by Nighbert to the Branch-Bank of Virginia at Charleston.   The indorsement of the note to the Branch-Bank of Virginia at Charleston was for the accommodation of both drawer and the indorser, Nighbert.   This note was after maturity assigned by James C. McFarland, president of the Branch-Bank of Virginia, at Charleston, with a number of other notes, to Isaac N. Smith for a valuable consideration, and was delivered to him without any indorsement thereon, except the blank indorse-

ment of the payee, Nighbert.  Afterwards money was deposited by Nighbert with the bank of Virginia at Charleston in the sum of $3,100, with which to pay this note.  Nighbert, who made the deposit of the money, did not know at the time he made same that the note had been assigned to Smith.  Suit was brought by Smith against Lawson and Nighbert for the recovery of the amount of the note, and it was held by the court that McFarland, the president of the Branch-Bank of Virginia, at Charleston, was without authority to make the assignment, and that Smith obtained no title, and therefore could not recover against defendants.  But the facts upon which the court made this finding are quite different from the facts in the case at bar.  In that case the consideration for which the president of the Bank at Charleston assigned the note to Smith, with other notes of the bank, was the payment of bank notes issued by the Bank of Virginia in the sum of $27,182, payable at Richmond, and at various other branches of said bank, and in payment of the sum of $1,500 on notes payable at the Branch-Bank of Virginia, at Charleston.  It had not been the custom of the bank in Charleston to take up and pay the notes of the Bank of Virginia payable at its other branches.  Of this fact Smith was advised at the time, and in the written assignment made by the president of the bank at Charleston to Smith of the note involved in that action it is stated by the president that he did not admit the right of Smith to present the notes of the Bank of Virginia payable at Richmond and other branches of the bank to the bank at Charlesfon, and the language of that assignment clearly advised Smith of the lack of authority of the president of the bank to assign the notes, and advised him that it was an unusual transaction of the bank.  It further appeared from the evidence that the directors of the bank, up to the time the suit was brought by Smith against Lawson, had never been advised of the action of its president, assigning the note, and had never confirmed such action.  That was a transaction by an officer of the bank not authorized by law, and out of the usual course of business of the bank, to-wit, paying off notes

of the principal bank of Virginia that were made payable at other branches of the bank, by assigning the promissory notes of the Branch-Bank, done upon threatened litigation. Smith, the holder of said note, threatened to attach the assets of the Branch-Bank at Charleston unless the president made some settlement of the notes held by him; but the facts in the case at bar do not present this condition. Dugan, who was held out by the bank as assistant cashier, authorized to do the necessary acts in the management and control of the bank, transferred the draft involved in this suit in a transaction that occurred daily in the business affairs of the bank. The evidence shows that on each day the balances due on clearings by the Citizens' Bank to other banks were settled by that bank. The method of settlement was, as a rule, to give a draft on the correspondent of the Citizens' Bank at Kansas City. The making settlement by the assistant cashier of the balance due by the Citizens' Bank to the First National Bank of the day's clearing was not an unusual transaction of the bank, and not unlike its daily transactions, except for the fact that it was not made until after banking hours, and that the payment was made in bills of exchange owned by the bank, instead of a draft on the correspondent at Kansas City. To say that the assistant cashier, Dugan, had power to issue a draft upon the bank at Kansas City for the balance due the First National Bank on the day's clearing, and yet would not have power to settle such balance by payment of money to the First National Bank or by transferring to the First National Bank negotiable instruments of the character of the one sued upon in this action, is an effort to make a distinction without a difference.

There is this further distinction between the facts of the case at bar and of the facts in the case of *Smith v. Lawson et al., supra.* In this case the Citizens' Bank received the benefits of the transaction and retained those benefits, and in the answer of the Citizens' Bank and of its receiver it is admitted that the draft in this action was assigned on the 19th day of April, 1904, by the Citizens' Bank to the plaintiff for value, thereby admitting the authority of Du-

gan to assign the draft. We recognize that this admission made in the separate answer of the Citizens' Bank and its receiver is not binding upon the defendant, Forbes; but is to be considered in connection with the evidence in the case as an act of the bank and its representatives recognizing the authority of Dugan to act as he did act upon the day the draft was assigned to plaintiff.

Our attention has also been called to the case of *Potter v. Merchants' Bank of Albany*, 28 N. Y. 641, 86 Am. Dec. 273, as supporting the theory of defendant that the First National Bank could obtain no title to the draft by the transfer made by Dugan. That was an action in the nature of trover brought by plaintiff, Potter, as receiver for the Bank of Medina, against the Merchants' Bank of Albany, for the conversion of a promissory note for $3,000. The facts in that case which distinguish it from the case at bar are well stated in that part of the opinion which we quote:

"It appeared on the trial that for 10 years prior to the 1st of June, 1861, the defendant had been the collecting agent of the Medina Bank; that the notes of the latter bank were sent to the former for collection, and when collected were credited on its books to the Bank of Medina, the latter drawing on it from time to time, and the drafts being charged against the Medina Bank, in account. On June 3, 1861, C. J. Beach, a clerk in the Medina Bank, whilst in charge of . of the bank, pursuant to the directions of John M. Kennan, the cashier, but without any authority from either the president or cashier so to do, inclosed the note in question to the Merchants' Bank of Albany, and directed it to be placed to the credit of the Medina Bank. * * * The note was received by the defendant, but its cashier refused to enter the same for discount. He did, however, enter it for collection; and on the 5th wrote to the Medina Bank, acknowledging the receipt of the note, but stating that it had not been indorsed by the bank, complaining of it as a strange proceeding, and demanding authority to treat it as the property of the bank. No such authority was ever given."

In that case the holder of the note was not a *bona fide* holder, and it was denied by the Bank of Medina that the person acting as assistant cashier had been given authority by either the

president or cashier of the bank to deliver the note to the holder thereof. The indorsement on the note was to the holder notice that the transaction was an unusual one, that there was something strange about the transaction, and the Merchants' Bank of Albany asked for authority from the Medina Bank to treat the note as its property which authority was not given. It was not shown that, in the transaction of the business of the bank, it became necessary for Beach, acting in the capacity of general manager in the absence of the cashier, to discount the note to the Merchants' Bank of Albany, or for him to depart from the course that had been practiced by the bank for 10 years prior thereto in sending notes to said bank for collection only; whereas, in the case at bar, the plaintiff is the holder of the draft for value, having obtained it from the assistant cashier of the Citizens' Bank in a transaction that daily occurred between said banks, and received it without any notice whatever of Forbes' equities or of Dugan's lack of authority to make such transfer, and the bank itself, acting through its receiver, in its answer admits the authority of Dugan to make such transfer.

A careful review of the record discloses no error for which the case should be reversed, and the judgment of the lower court is affirmed.

All the Justices concur.