FIRST NAT. BANK OF WATONGA *et al.* v. WADE *et al.*

No. 589.    Opinion Filed September 13, 1910.

(111 Pac. 205.)

**BILLS AND NOTES—Bona Fide Purchasers—Fraud.** Where an illiterate colored woman over 70 years of age was by false and fraudulent representations induced to sign certain negotiable promissory notes and mortgages securing the payment of the same under the belief that she was signing her last will and testament and a power of attorney, such promissory notes are unenforceable in the hands of a **bona fide** holder; it appearing that the maker was free from negligence.

(Syllabus by the Court.)

*Error from District Court, Garfield County; P. C. Simons, Judge Pro Tem.*

Action by Mary Wade and others against the First National Bank of Watonga and others. Judgment for plaintiffs, and defendants bring error. Affirmed.

*Robberts & Curran* and *Seymour Foose,* for plaintiffs in error. —Citing *Forbes v. First National Bank,* 21 Okla. 206.

*Seymour Foose,* for plaintiff in error R. I. Temple.

*Daniel Huett* and *Moore & Moore,* for defendants in error. —Citing: 1 Page on Contracts, 116; *De Camp v. Hamma,* 29 Ohio St. 467; *Yakima Valley Bank v. McAllister* (Wash.) 1 L. R. A. (N. S.) 1075; *Green v. Wilkie,* 98 Iowa, 74; *Gibbs v. Linabury,* 22 Mich. 478.

KANE, J.  This was an action commenced by the defendant in error, Mary Wade, plaintiff below, against the plaintiffs in error,

defendants below, for the purpose of procuring the cancellation of certain promissory notes and mortgages which the plaintiff claimed were procured from her by fraud, deceit and trickery on the part of the defendants, P. F. Tyler and Ben Smith. The evidence tended to show, and the court and jury so found: That the plaintiff is an aged, infirm negress, of poor eyesight and hearing, entirely unable to either read or write. That the defendants, Tyler and Smith, one a colored and one a white man, and both admitted to the practice of law, called on her at her residence in the city of Enid, Okla., on or about the 14th day of August, 1905, and told her that they were appointed by the Governor of Oklahoma to prepare the last will and testament of all old colored people, and had called upon her for that purpose. That they also told her that they would be able to procure a purchaser for a piece of land that she owned in Blaine county. After talking these matters over, it was agreed that Smith and Tyler should draft her last will and testament and a power of attorney authorizing them to sell her Blaine county land. In pursuance of this agreement, a last will and testament and power of attorney were drawn and read over to her by Smith and Tyler, and then reread to her by a colored girl who was present at the time, named Blanche Marshall. When these instruments were completed and read over to her, Tyler and Smith asked for a drink of water, whereupon the colored girl went to the pump for the purpose of getting the water, and the old colored woman stepped out of the room where the papers were drawn, and where they all were, into an adjoining room to get a tumbler. While the girl and the old woman were gone, Smith and Tyler substituted for the papers that they had read to the old woman the notes and mortgages in controversy, which in general appearance resembled the writings that had been theretofore read, and the old woman, believing they were the same papers, signed them by mark. After the signatures were secured, a notary was called, who asked the old woman if she acknowledged the papers, without reading or explaining them to her, and she said that she did. The papers she signed turned out to be a note for $2,500,

with a mortgage on real estate owned by the old woman, and another note for $500, similarly secured, both running five years, at 12 per cent. per annum. After procuring the notes and mortgages, as aforesaid, Smith and Tyler sold the $500 note and the mortgage securing the same to the defendant, Temple, for $475, and a few days thereafter hypothecated the $2,500 note and mortgage to secure a loan of $1,200 from the defendant, the First National Bank of Watonga. Said Smith and Tyler indorsed said note for $2,500 by writing their names on the back thereof at the time of its delivery to said bank. The case was tried before Hon. P. C. Simons, who was selected as judge *pro tempore,* and a jury was impaneled and sworn to make certain special findings of fact advisory to the court.

Among the interrogatories propounded to the jury which we think are important to a decision in this case are the following:

"Did Mary Wade, when she signed certain papers, know that she was signing a note for $2,500 and mortgage for the same sum, and a note and mortgage for $500? Answer: No. When Mary Wade signed the papers she did sign, did she do so by reason of the fraudulent representations of Tyler and Smith, and in the belief that she was signing her will and also a power of attorney? Answer: Yes. When Mary Wade signed the papers she did sign, did she believe that she was signing notes and mortgages for $3,000? Answer: No. Was it the notes and mortgages or was it the will and power of attorney that had been read to her by Ben Smith and Blanche Marshall? Answer: The will and power of attorney. Did she intend to sign the will and power of attorney? Answer: Yes. Did she intend to sign the notes and mortgages? Answer: No. Did she know that there were mortgages and notes to be signed? Answer: No. What was her age in years at the time of this transaction? Answer: About 70 years old. Could she then or can she now read or write? Answer: No. Did she take every precaution possible to know the exact contents of the papers before she signed them? Answer: Yes. Was she guilty of any negligence in signing the papers she did sign? Answer: No."

There was judgment for the plaintiff, to reverse which this proceeding in error was commenced.

Counsel for the bank state the issue between the plaintiff and their client as they understand it, as follows:

"The issue between the plaintiff and the defendant bank was, Did the bank loan money to Smith and Tyler and take from them a note and mortgage of Mary Wade as collateral security to said loan as an indorsee without having knowledge of any fraud or artifice having been practiced on the said plaintiff in the securing of her signature to said note and mortgage?"

And counsel for defendant Temple states his views of the case as follows:

"The issues in the trial of the case as between the plaintiff and the defendant, Temple, were: Did the defendant, Temple, purchase the $500 note and mortgage executed by Mary Wade from Smith and Tyler before maturity of such obligation, and, if so, did Temple, at the time of such purchase, have knowledge of the alleged fraud and artifice by which Smith and Tyler are alleged to have obtained the signature of Mary Wade to such obligation?"

We do not believe this is one of that class of cases to which the rule invoked by counsel is applicable. We are inclined to agree with counsel that there was not sufficient evidence adduced to show bad faith on the part of their clients in acquiring these notes and mortgages. This court is committed to the doctrine that bad faith, not merely a notice of circumstances sufficient to put a prudent man on inquiry, is necessary to defeat recovery by the holder of negotiable paper, whose right accrued before maturity. *Forbes v. First National Bank,* 21 Okla. 206, 95 Pac. 785. But in the case at bar the jury found that the signature of the maker was procured by false representations as to the character of the paper itself, and that the maker was not guilty of any negligence in signing such papers. In that class of cases the rule laid down in 1 Page on Contracts, 116, is applicable:

"If the instrument is negotiable, and in the hands of a *bona fide* holder, the question of negligence is held the test of liability. If the maker signed without knowing the nature of the instrument and was free from negligence, as in the case of illiteracy, as where he could not read, and a note of $1,000 was read to him as $100, and the name of the payee was changed, the note is unenforceable even in the hands of a *bona fide* holder."

Counsel for defendants in error cite a great many cases in support of the rule laid down by Mr. Page. We have examined most of them, and believe that the rule is amply supported. Practically all the cases on this question are collected in notes to *Yakima Valley Bank v. McAllister* (Wash.) 1 L. R. A. (N. S.) 1075, and *Green v. Wilkie,* 98 Iowa, 74, 36 L. R. A. 434, 66 N. W. 1046.

The syllabus to the latter case reads:

"In an action on a note and mortgage for $1,000, it appeared that they were given to F.'s wife, and by her assigned to plaintiff, without notice; that defendant, the maker, about to sell a piece of land given him by his father, and purchase another, went to the office of F., who was acting for the person to whom defendant was selling, and the sale and purchase were completed; that there had been a lease on the land in favor of defendant's father, whereby defendant was required to pay a certain rent while he remained single, and that this had been released to enable defendant to sell; that afterwards, at F.'s suggestion, defendant agreed to make a new lease and note for $100 to his father on the land purhcased; that F., at his office, prepared, instead, the note and mortgage in suit, which defendant afterwards signed, thinking them to be the note and lease agreed on; that defendant could not read, and could write only his name; that he never received anything for the note, and never agreed to make it. *Held,* that the note never had an existence in the sense of the minds of the parties meeting to give it validity."

Another case worthy of note on account of its similarity to the case at bar is *De Camp v. Hamma,* 29 Ohio St. 467. In that case the jury answered interrogatories as follows:

"Did Hamma sign the promissory note in the petition described? Answer: Yes. Did plaintiff, before the maturity thereoi, purchase the same *bona fide,* and for a valuable consideration? Answer: Yes. Was the note fraudulently obtained from Hamma by Denning, the payee? Answer: Yes. Was the signature of Hamma to the promissory note obtained by fraudulent representations as to the character of the paper itself? Answer: Yes. Was Hamma, at the time of signing it, ignorant of its real character, and had no intention of signing a note? Answer: Yes. Was he guilty of negligence of ordinary care in affixing his signature thereto, or in not ascertaining the character of the instrument or in any other respect? Answer: He was not."

It was held:

"In an action against the makers by an indorsee of a negotiable promissory note who purchased the same for a valuable consideration before maturity, and without notice of any fraud or infirmity as between the original parties, the defendant is not liable where it is shown: (1) That at the time of signing and delivering the note he was induced by fraudulent representations as to the character of the paper to believe that he was signing and delivering an instrument other than a promissory note. (2) That his ignorance of the true character of the paper was not attributable in whole or in part to his own negligence in the premises."

Finding no reversible error in the record, the judgment of the court below is affirmed.

All the Justices concur.