## McNAC v. BROWN et al.

No. 10600—Opinion Filed May 9, 1922.

Rehearing Denied July 25, 1922.

(Syllabus.)

**1. Deeds—Validity—Fraud.**

Where an illiterate Indian was by false and fraudulent representations induced · to sign a certain deed under the belief that he was signing a paper to rectify an oil and gas lease, and it appearing he was not guilty of any negligence on his part, such deed is absolutely void and does not convey any title to the grantee.

**2. Same—Void Deeds—Rights of Innocent Mortgagee.**

Where the grantee of such void deed, immediately after receiving the same, executes a mortgage on the land described in such deed, held, that the grantee did not have any title to the land, and therefore the mortgage executed by him did not create any lien on the land.

Error from District Court, McIntosh County; R. W. Higgins, Judge.

Action by Joe McNac against Louis Brown and another to cancel a deed. Judgment for defendants denying the cancellation of the deed. Plaintiff appeals. Reversed and remanded.

Charles R. Freeman, for plaintiff in error.

Turner & Turner, for defendants in error.

MILLER, J. This action was commenced in the district court of McIntosh county by Joe McNac, as plaintiff, against Louis Brown and the Waddell Investment Company, a corporation, as defendants, to cancel a certain deed covering lots 3 and 4 and the east $\frac{1}{2}$ of the southwest $\frac{1}{4}$ of section 19, township 12 north, range 16 east, and containing 165.28 acres more or less, and being the allotment of Peter McNac, deceased. This deed was executed on the 30th day of April, 1917. The action was filed in the district court on January 3, 1918. The case was tried before the court without a jury on the 9th day of September, 1918, which resulted in a judgment in favor of the defendants, holding the deed to be a valid conveyance. The plaintiff filed his motion for a new trial, which was overruled by the court, saved all necessary exceptions and perfected this appeal. He has set out 12 specific assignments of error, but discusses them under one proposition, which is—

"That the judgment of the trial court is not supported by the evidence and is clearly against the weight of the evidence."

We agree with this contention.

The undisputed facts, as disclosed by this record, are as follows:

The land in controversy was allotted to the heirs of Peter McNac, who was a member of the Creek or Muskogee Tribe of Indians, and died intestate prior to receiving his allotment. Joe McNac is the sole surviving heir of Peter McNac, deceased, and was known in the community where he lived as George McNac. The mother of Joe McNac was a Seminole Indian and Joe was enrolled on the authenticated rolls of the Seminole Nation opposite roll No. 1720 as a half-blood, and was about 42 years old in 1917. On and prior to April 30, 1917, Joe McNac was in possession of the above described premises by George Wolf, his tenant. Joe McNac was uneducated and could not speak, write, or understand the English language.

Witnesses for both plaintiff and defendants testified that the land in controversy was good creek bottom land. The lowest estimate placed upon its value is by defendant Louis Brown, and he places it at from $2,000 to $2,500. One of the defendants' own witnesses, W. R. Smith, testified that he had been in the farm loan, lease, and land business and was familiar with the value of land throughout the county; that he was familiar with the land in controversy and had planned to buy it at one time, and that it was of the reasonable market value of $25 an acre on April 30, 1917. This would make the land worth at least $4,125.

Taylor Timothy, a Creek Indian, acted as agent for defendant Louis Brown in negotiating the deal and obtaining the deed from Joe McNac. The price paid by Louis Brown for the land was $1,150, and Brown paid Taylor Timothy $100 for his service in negotiating the deal. The deal was closed and the deed executed on April · 30, 1917.

Thereafter Louis Brown obtained a loan of $1,500 from the Waddell Investment Company, secured by a first mortgage on the above described land, which mortgage bears date of June 7, 1917. Louis Brown also executed a second mortgage to the Waddell Investment Company on the above described land to secure the payment of $212, which was a commission mortgage. Sometime after the execution and delivery of the instrument, which appears to be a deed, a notice was served on George Wolf, as tenant, to vacate the premises.

The disputed fact is—

"Did Joe McNac understand he was selling this land and that he was executing a deed to convey the land to Louis Brown?"

A number of witnesses testified, and some of the evidence is conflicting. Joe McNac testified that George Carr had an oil and gas lease on the land and he thought he was signing another oil and gas lease, or renewing the old lease, and was to receive $1,150 for the lease. The first knowledge he had that the paper signed by him was anything other than an oil and gas lease was when the notice was given to his tenant, George Wolf, that Louis Brown wanted possession. The $1,150 had been paid by draft and deposited to McNac's credit in the First National Bank of Checotah, Okla. He immediately went to the First National Bank to investigate the matter and took with him Taylor Timothy. There he had a conversation with Eastman Richards, who appears to be a disinterested witness, but testified in behalf of the plaintiff in part as follows:

"Q. I will ask you if Joe McNac came to you at Checotah in company with Taylor Timothy some time along in the summer of 1917, last summer, there at the bank and asked you to make some investigation relative to some transaction with Brown Brothers about his land? A. Yes, sir. Q. Just state to the court what it was that McNac was trying to do. A. I was at the First National Bank when Taylor and George got there, and I was there and he wanted to find out what kind of a paper it was, and I asked, so they got the paper, and they mentioned sometime about oil lease, and that was my first hearing anything about that; said it was a lease. Q. Who said that? A. George. Q. What did Taylor say about it? A. Taylor he was standing there and I turns around and asked Taylor about that— 'What was that thing you had, was it a lease'—and Taylor studied quite a while and he says he thinks it was a lease. Q. Was George trying to find out from the bank what sort of a paper it was, from Mr. Hill or some of them? A. I think he was; he was standing there trying to find out. Q.

And he asked you to investigate for him? A. -He asked me, he wanted to know how much money was there. Q. How much money they left there? A. Yes, that is what he asked me, and then I turned and asked Mr. Hall or Mr. Martin, one of those men, and they said $1,150 was there, and and then I turned asked George, 'What you want me to do with it?' Q. And then you say that Taylor stated to you— A. I asked him what kind of a paper it was, deed or lease, and he says, 'I guess it was a lease.' * * * Q. But, you do know that Taylor Timothy told you there he thought it was a lease he took from George? A. Yes, thought it was an oil lease."

Taylor Timothy testified that he talked to Joe McNac about Joe selling the land. That he did not talk about leasing it. That he told Joe it was a deed he was to sign. On cross-examination, he was asked if he did not tell Joe it was a paper. He stated emphatically that he told him it was a deed, but a careful examination of his testimony discloses that in his unguarded moments he always referred to it as a paper. He further testified that Joe McNac said he wanted to see Taylor Timothy's brother, John Timothy, and if John Timothey said it was all right for him to sign the paper, he would sign it. On cross-examination, Taylor Timothy was asked the following question and gave the following answer:

"Q. Now, when you got the deed over there at Pierce you did the talking, did you not, to George McNac? A. I told him that he could sign the paper if he wished to, and he said, 'If your older brother will so instruct me, I will sign it,' and I says, 'Well, my brother lives right down there—do see him and see what he says to you about it'; and he seemed to have advised him that it was the proper thing to do and the brother told Taylor here that 'he seems to be willing to sign the paper,' and then the trade was consummated."

John Timothy was called as a witness in behalf of the plaintiff, and he testified that Taylor Timothy told him it was a lease he wanted Joe McNac to sign; that there was some defect about the original lease McNac had made to George Carr and this was to rectify the original lease, so that Carr could sell the lease to somebody else. John Timothy was one of the witnesses to the paper, but understood he was witnessing McNac's signature to an oil and gas lease to correct some mistake in the lease originally made to Carr.

About the time the Waddell Investment Company was closing up the loan with Louis Brown they wanted an affidavit to the effect that the deed executed by Joe McNac to

Louis Brown was not intended as a mortgage but intended to convey the fee. An affidavit to this effect was offered in evidence having upon it a thumb mark and the name of Joe McNac. He denied having executed it. Witnesses in behalf of the defendants testified that Joe McNac did execute the instrument. The name of N. W. Creswell appeared as a witness to the execution of this affidavit. He testified in behalf of the plaintiff that he had no recollection of witnessing Joe McNac's thumb mark on the affidavit. He admitted that the last part of his name as written on the affidavit looked like his signature. It is clear to us from an examination of all the testimony concerning this affidavit that Joe McNac did not understand the purpose of the affidavit if he did sign it. Therefore, we do not consider this affidavit material, except going to the credibility of Joe McNac as a witness. After a careful consideration of the questions propounded and the answers given by Joe McNac touching this affidavit, and in view of all of his testimony concerning the other transactions and of the fact that his testimony has been corroborated by disinterested witnesses, we do not think it discredits his testimony.

R. D. Martin testified in behalf of the defendants that he was president of the First National Bank of Checotah. That he knew the Indian, George McNac, and identified him to be the same person as the plaintiff, Joe McNac. He testified it was through his bank the draft of $1,150 was collected for Joe McNac. He was then asked the following question and gave the following answer:

"Q. Mr. Martin, has any money been checked out, any of that money been checked out? A. His account is very inactive. I can't say any of that money has been checked out; that would be hard to answer; as his balance is in excess of that amount I could not tell what money he has checked out; his balance is in excess of that amount now."

It also appears in the record that Joe McNac refused to take the money out of the bank when he understood there was a dispute as to whether the land was sold or leased. He immediately thereafter repudiated the transaction, brought this action to cancel the deed, and tendered back the money he had received for it. It cannot be questioned but that Joe McNac has acted in good faith and with diligence in rectifying the mistake that had been made. The mistake was not his fault, but due to the misrepresentations made by Taylor Timothy, the agent of Louis Brown.

Under this evidence it is clear that Joe McNac thought he was signing an oil and gas lease, and not a deed to this land, therefore the deed is absolutely void and did not convey any title whatever to Louis Brown. The deed was procured by false representations as to the character of the paper itself and the maker was not guilty of any negligence in signing the paper. He could not read or write and as an extra precaution he sought the advice of John Timothy, the brother of Taylor Timothy. Taylor Timothy told his brother, John, it was an oil and gas lease to rectify some mistake in the oil and gas lease held by Carr, and upon these representations John Timothy advised Joe McNac it was all right to sign the paper. This principle has been laid down in the very able opinion by Kane, J., in First National Bank of Watonga v. Wade et al., 27 Okla. 102, 111 Pac. 205. The syllabus reads as follows:

"Where an illiterate colored woman over 70 years of age was by false and fraudulent representations induced to sign certain negotiable promissory notes and mortgages securing the payment of the same under the belief that she was signing her last will and testament and a power of attorney, such promissory notes are unenforceable in the hands of a bona fide holder; it appearing that the maker was free from negligence."

The deed being void, Louis Brown did not have any title to the land, and under the rule laid down in the above case, it follows that the mortgage given by Brown to the Waddell Investment Company did not create a lien upon the land.

The judgment of the trial court is reversed, and this cause is remanded, with instructions to the trial court to accept the tender of $1,150, and thereupon cancel said deed and mortgages, and if defendant is entitled to recover any money on account of taxes paid, that he be given judgment for the amount paid out for taxes, together with interest on the money so paid out for taxes at the rate of six per cent. per annum. The clerk of said court shall hold all money so paid in until the further order of the trial court, and the trial court shall make such further orders as may be necessary to protect any rights defendant Waddell Investment Company may have as against defendant Louis Brown.

HARRISON, C. J., and KANE, JOHNSON, and KENNAMER, JJ., concur.