[Civ. No. 5441. Second Appellate District, Division Two.—September 30, 1929.]

ELMA McELHANEY, Respondent, v. W. E. MOYER & COMPANY, a Corporation, Appellant.

Frank F. Doherty and Franklin W. Peck for Appellant.

Brown & Bissell and Ben S. Berry for Respondent.

BURNELL, J., *pro tem.*—Respondent brought this action to recover the value of certain shares of stock which she claimed had been secured from her by fraud on the part of the appellant corporation. Appellant's chief contention is that the evidence does not support the finding of fraud. We have examined the transcript with care, and while the evidence is conflicting there is abundant evidence to support the court's findings in this regard.

It appears from the testimony of the respondent and of various other witnesses that prior to January, 1924, respondent owned two units of stock in a corporation known as Commercial Loan Company, each unit consisting of two shares of preferred and one of common stock. Her first transaction with appellant was in that month and consisted of the signing of a subscription agreement for four shares of stock of a corporation known as United Camps, at $100 per share, payable in installments of $25 a month. The certificates representing these shares were never delivered to her. On its face the subscription agreement appears to establish a contractual relation between respondent and United Camps. There is evidence, however, to the effect that Moyer & Company was actually selling to respondent stock which was owned by itself; that her "subscription" was never turned in to United Camps, which corporation incidentally had power under its permit from the corporation commissioner to sell for cash only and not on installment payments and that she was charged on appellant's books with the agreed purchase price of the stock and credited with her payments thereon.

In March, 1924, respondent called at appellant's office in response to a letter from Mr. Moyer, its president and general manager, suggesting switching her subscription for United Camps to one for four shares of Moyer & Company stock at $100 per share. To this she agreed. At this time she sold to appellant her Commercial Loan Company stock for $470, receiving $300 in cash and a credit of $170 on her account for the purchase of the Moyer & Company stock, pursuant to the arrangement for taking that stock instead of United Camps. She kept up her payments until they were completed and then received certificates evidencing

her ownership of the Moyer & Company stock. This was the only stock received by her from appellant.

In June, 1924, respondent went to work for appellant as a stenographer and at this time agreed to purchase five additional shares of its corporate stock at $100 per share, payable at $5 a week, which was to be deducted from her weekly salary. When she left her position she had a credit of $70 on this last subscription. The situation thus stood at the time of the transaction next to be referred to: respondent had sold her Commercial Loan Company stock to appellant for $470; she had purchased four shares of Moyer & Company stock and had paid therefor $400, and had a credit of $70 on the uncompleted purchase of five more shares of Moyer & Company stock.

In September, 1924, according to respondent's testimony, Mr. Moyer called her into his office to take dictation and when that was completed he said that he understood that she was dissatisfied with her Moyer & Company stock and was trying to dispose of it. She told him this was true. Mr. Moyer then expressed his regret and said that he did not blame her for feeling as she did because there were several lawsuits involving the corporation. She also testified that Moyer told her "there were many things to make me feel uneasy about the stock that I held and that he wanted to treat me as he would his mother, and that he did not want me to lose a dollar, he was going to make it so that I would never lose a dollar on Moyer & Company, or lose a night's sleep or have any worry in any way." He then said to her, according to her testimony, "Now, I am going to give you back the stock that I got of you, and I will take back what you got of me and place you exactly the same as you were before you knew there was a Moyer & Company or before you had any business with us, and then no matter what happens to Moyer & Company, you will be the same as you were, and will not blame me in any way." To this and similar statements on the part of Mr. Moyer respondent testified that her reply was: "I would be very glad to get the stock back that I had sold him." At this point we pause to call attention to the fact that prior to coming in contact with Moyer & Company respondent had the Commercial Loan Company stock and that that was the only stock which she had sold to appellant corporation.

Mr. Moyer then produced two little slips and said to respondent, ''I am going to get you to sign these little slips which go to show just what we have done, that we have made the exchange of stock.'' The only exchange they could possibly have been referring to was the exchange of the Commercial Loan Company stock which appellant had acquired from respondent, for the Moyer & Company stock which respondent had acquired from appellant. The amount which respondent had received for the Commercial Loan Company stock, $470, exactly equalled the amount which she had paid for the Moyer & Company stock actually received by her, plus the $70 paid on the additional subscription. Respondent further testified that Mr. Moyer covered with his hands all but the places for respondent's signature on the slips referred to and asked her to sign without reading them, stating that he was in a hurry. He pretended, however, to tell her the purport of the documents which she had signed, ''he said it was just making a statement that we were exchanging the stock.'' Respondent further testified that she signed these slips believing every word Mr. Moyer had said. Respondent then, according to her testimony ''thanked him profusely for returning the Commercial Loan Company stock'' to her and proceeded about her business in connection with the office. Later on, Mrs. Moyer, who was also connected with the corporation as one of its officers, handed her the slips which she had signed. She then discovered that they were actually buy and sell orders, one of them being an order for the sale of the Moyer & Company stock and the other for the purchase of United Camps, the two documents being so worded that the proceeds of the sale of the Moyer & Company stock were to be applied on the purchase of the United Camps stock. Nothing was said in either document as to the Commercial Loan Company stock.

We think that this evidence is amply sufficient to justify the trial court in finding that appellant had practiced fraud upon respondent. The nature of the transaction was not only concealed from her but she was actually misinformed with respect thereto by her employer, in whom she had every right to repose her trust and confidence. Instead of being put in the same position in which she was prior to falling into the hands of Moyer & Company,

namely: having her Commercial Loan Company stock returned to her in exchange for her Moyer & Company stock, she was placed in the position of exchanging her Moyer & Company stock for stock which the evidence shows almost without question to have been utterly worthless, stock which Mr. Moyer himself recognized as being of no value, as is evidenced by his communication to the corporation commissioner, which is set out in the transcript and in which he charged mismanagement and incompetence on the part of the officers of United Camps and that the "income and future prospects of the company are greatly impaired if not wholly destroyed by the incumbent officers" and suggested that the corporation commissioner should act to protect others from purchasing stock in this company.

There is, of course, evidence going to contradict that of respondent. In other words, this is a clear case of conflicting evidence and in such a case it has been so repeatedly held that the finding will not be disturbed by the appellate tribunal, as to render the citation of authorities unnecessary.

The remaining point urged by appellant, namely, that the action is not in the proper form and that respondent should have brought a suit for rescission of the contract and not for money had and received is entirely without merit. ■ An action for rescission must of necessity rest upon the existence of a contract to be rescinded. Where there is no meeting of the minds there can be no contract and hence there is nothing which can be rescinded. (*Hardison* v. *Davis*, 131 Cal. 635 [63 Pac. 1005].) ■ Respondent, relying upon the statements and promises of Mr. Moyer, believed that the transaction was one in which she was to receive back the stock she had sold to Moyer & Company, namely, that of the Commercial Loan Company, in return for the stock which she had purchased from the Moyer Company. She was induced to sign the agreements which she believed evidenced that transaction, without reading them and she was so induced by deliberate and false statements on the part of Mr. Moyer. In such a case there is no necessity for attempting to rescind that which never in fact existed. (*Meyer* v. *Haas*, 126 Cal. 560 [58 Pac. 1042]; *Calmon* v. *Sarraille*, 142 Cal. 638 [76 Pac. 486]; *Hoowe* v. *Kreling*, 93 Cal. 136 [28 Pac. 1042]; *Togni* v. *Taminelli*, 11 Cal.

App. 7 [103 Pac. 899]; *King* v. *Globe Grain Co.*, 58 Cal. App. 105 [208 Pac. 166].)

The judgment is affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.