[S. F. No. 17077.   In Bank.   Dec. 28, 1944.]

C. I. T. CORPORATION (a Corporation), Appellant, v. MARTIN PANAC et al., Respondents.

Francis W. Collins for Appellant.

Francis P. Healey and John Jewett Earle for Respóndents.

CARTER, J.—In this action on two negotiable promissory notes by the plaintiff, a holder in due course, against defendants as makers, the latters' defense of fraud by an agent of the payee in the execution of the notes was sustained by the trial court sitting without a jury.

The court found that defendants are husband and wife; that they are illiterate, being unable to read or write the English language, and William Hart the agent of the payee knew of that fact; that Hart gained the trust and confidence of defendants and secured their signatures to the notes by false representations which induced the defendants to believe that they were signing a contract to repair dwelling houses and nothing else, and that defendants were ignorant of the fact that they were signing notes; that defendants relied upon such false representations and were prevented thereby from seeking independent advice although they requested that they be permitted to obtain it; that defendants were not negligent in signing the notes; and that plaintiff is a holder in due course and had no notice of any infirmities in the notes at the time they were acquired.

Turning first to the question of whether or not defendants' defense was real, and hence good against plaintiff as a holder in due course, we are satisfied that the answer must be in the affirmative. The issue is whether a maker of a negotiable instrument may prevail against a holder in due course on a defense that in fact no contract-negotiable instrument was made or consented to by the maker. Where the maker does not consent to execute a negotiable instrument but nevertheless signs it, understanding it to be some other document, is he obligated to a holder in due course? There is a manifest distinction between fraud in the execution—in the fact of whether or not an instrument has been executed at all, and fraud in the inducement, that is, where because of the fraudulent representation of the payee, the maker knowingly and voluntarily executes the note, but it is voidable because of the fraud inducing him to execute it. In the former there is no contract whatever. In the latter there is a contract which is voidable for fraud. This distinction is discussed in Williston on Contracts (rev. ed.), section 95A as follows:

"Though manifestation of assent and not actual assent creates a contract, a writing purporting to be a contract and not

ambiguous in its language may be wholly *void*. If without negligence on his part, a signer attaches his signature to a paper assuming it to be a paper of a different character, *the paper is void*. Such a mistake as to the character of the instrument may relate to *its existence as a contract* or legally operative document of any kind, or to whether it is the kind of contract or legal document which it purports or is represented to be. In the former case, it is much easier to establish that there was no mutual assent. Negligence is there much less of a factor, since the average reasonable man would not be expected to exercise that caution which he would if he knew that he was signing what purported to be a legal document; particularly if he intended to become a party thereto. In the latter type of case, such a mistake without negligence will not often occur in the absence of some such fraud, as substituting by sleight-of-hand, for a paper which has been agreed upon, a different one. Nevertheless, the situation is possible without actual fraud, and if it occurs whether induced by fraud, or without it, no contract is formed.

"It is as if the offeror in his sleep said words expressive of an offer, which were accepted. Though neither the will to create a legal obligation, nor accurate understanding of the meaning of an offer and acceptance is essential to the creation of a contract, intent to do the act which amounts to an offer or acceptance, or at least negligently allowing the appearance of such an intent, is essential." (Italics added.) And section 1488:

"Fraud may induce a person to *assent* to do something which he would not otherwise have done, or it may induce him to believe that the act which he does is something other than it actually is. In the first case the act of the defrauded person is operative though *voidable*; in the second case *the act of the defrauded person is void*, because he does not know he is doing and does not intend to do this act. This distinction most commonly arises in the law of negotiable paper . . . Where a person is fraudulently induced to sign or indorse a bill or note in the reasonable belief that he is signing something else, *he cannot really be said to have made or indorsed the bill or note*; hence the ancient plea of non est factum is applicable.

"If, however, the signer has been negligent, a holder in due course should be allowed to recover and it seems that one who,

in the absence of extenuating circumstances, relies without investigation of his own on the representations of the person at whose request he signs is guilty of negligence.'' (Italics added.) (See, also, Rest., Contracts, § 475; *Cummings* v. *Ross*, 90 Cal. 68 [27 P. 62]; *McElhaney* v. *W. E. Moyer & Co.*, 101 Cal.App. 53 [281 P. 87]; *Raynale* v. *Yellow Cab Co.*, 115 Cal.App. 90 [300 P. 991].)

By the overwhelming weight of authority a negotiable instrument which is void under the foregoing circumstances, where there is in fact no contract or there is fraud in the execution, is not enforceable by a holder in due course in the absence of negligence on the part of the maker; that is, the maker has a real defense to an action thereon. (*M. & J. Finance Corporation* v. *Rinehardt*, 216 N.C. 380 [5 S.E.2d 138]; *Parker* v. *Thomas*, 192 N.C. 798 [136 S.E. 118]; *Gate City Nat. Bank* v. *Bunton*, 316 Mo. 1338 [296 S.W. 375]; *First Nat. Bank* v. *Hall*, 129 Mo.App. 286 [108 S.W. 633]; *Robertson* v. *Budzier*, 229 Mich. 619 [201 N.W. 949]; *Harber* v. *Lincoln*, 175 Okla. 221 [51 P.2d 967]; *First Nat. Bank* v. *Wade*, 27 Okla. 102 [111 P. 205, 35 L.R.A.N.S. 775]; *Gross* v. *Ohio Savings & Trust Co.*, 116 Ohio St. 230 [156 N.E. 205]; *De Camp* v. *Hamma*, 29 Ohio St. 467; *Yakima Valley Bank* v. *McAllister*, 37 Wash. 566 [79 P. 1119, 107 Am.St.Rep. 823, 1 L.R.A.N.S. 1075]; *Thompson* v. *C. I. T. Corporation*, (Tex. Civ.App.) 157 S.W.2d 961; *Security Finance Co.* v. *Floyd*, (Tex.Civ.App.) 294 S.W. 1113; *Foster* v. *McKinnon*, L.R. 40 P. 704; *Lewis* v. *Clay*, 67 L.J.Q.B. 224; see 10 C.J.S. Bills & Notes, § 499(b); 8 Am.Jur. Bills & Notes, § 589; 36 L.R.A. 435; 35 L.R.A.N.S. 776; Williston on Contracts (rev. ed.), §§ 95A, 1159, 1488; 12 Va.L.Rev. 324; Britton on Bills & Notes, § 130; Brannon's Negotiable Instruments Law, Bentel (6th ed.), pp. 623-627; Joyce, Defenses to Commercial Paper (2d ed.), §§ 81, 82, 96-98, 223; 2 Daniels on Negotiable Instruments (7th ed.), p. 1075, §§ 991-992; 9 Tulane Law Rev. 78; 6 Ore.L.Rev. 160; 6 Tex. L.Rev. 114; 12 *id.* 228; 13 Mich.L. Rev. 601; 29 YaleL.J. 797.)

The rule has been declared by statute in some states. (See 8 Am.Jur. Bills & Notes, § 589, ft. n. 5.) The rule has not been changed by the uniform negotiable instruments law. (*M. & J. Finance Corporation* v. *Rinehardt, supra; Security Finance Co.* v. *Floyd, supra.*) Nor by the bills of exchange act in England the wording of which is practically the same

as the uniform negotiable instruments law. (*Lewis* v. *Clay, supra.*) The authorities have held the defense to be real under the uniform negotiable instruments law although not expressly discussing the act. (See cases cited: 12 Va.L.Rev. 324; 9 Tulane L.Rev. 78.) A like construction should be placed upon the negotiable instruments law of this state contained in section 3136 of the Civil Code which provides:

"The title of a person who negotiates an instrument is defective within the meaning of this title when he obtained the instrument, or any signature thereto, by fraud, duress, or force .and fear,` or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud." And section 3138, providing:

"A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon." It was not intended by the enactment of the negotiable instruments law that the whole law of contracts was to be abrogated unless clearly· indicated. The defense under consideration goes to the existence of any contract. If there is no contract there is no negotiable instrument, which is a simple contract. As stated in Williston on Contracts, (rev. ed.), § 1159:

"The words 'defect of title' in this section (Section 57 of the N. I. L. Civil Code, sec. 3138) even when aided by section 55 (Civil Code sec. 3136) and by the definition of 'holder' do not indicate with perfect clearness that it is only personal or equitable defenses from which the holder is freed, but there was probably no intention to change the law in regard to the matter, and there is no reason to suppose that a change has been effected. Therefore, though in some cases a purchaser of an instrument payable to bearer can enforce it even though by common law or statute the instrument was originally void, yet where the instrument was originally void and there are either no circumstances justifying an estoppel or, though there are, the policy of the law forbids enforcement of the instrument even by a holder in due course, such a holder, according to the better view, cannot recover under the Statute any more than under the previously prevailing law." (See to the same effect 12 Va.L.Rev. 324; 2 Daniel on Negotiable In-

struments (7th ed.) §§ 937-941, 997.) And that is conceded to be true by Professor William E. Britton, who takes the position that such a defense should not be available against a holder in due course. (9 Cornell Law Quarterly 138, 156-158.)

It is a fundamental principle that there should be uniformity in the negotiable instruments law between states as well as within a state and the courts should have that in mind as their guiding thought in construing the statutory law on the subject. (See Civ. Code, § 3266d; *Aud* v. *Magruder*, 10 Cal. 282; *Utah State National Bank* v. *Smith*, 180 Cal. 1 [179 P. 160]; *Security Commercial & Savings Bank* v. *Southern T. & C. Bank*, 74 Cal.App. 734 [241 P. 945]; *Bank of Italy Nat. Trust & Savings Assn.* v. *Symmes*, 118 Cal.App. 716 [5 P.2d 956]; *Charles Nelson Co.* v. *Morton*, 106 Cal.App. 144 [288 P. 845]; 7 Cal.L.Rev. 263.) Therefore the goal of having the law of negotiable instruments certain and uniform will best be advanced by the adoption of a rule followed by the great weight of authority.

The only case in California that has discussed the subject is *Bedell* v. *Herring*, 77 Cal. 572 [20 P. 129, 11 Am. St.Rep. 307], decided before the adoption of the negotiable instruments law. It involved an action by a holder in due course against the maker on a promissory note, the maker's defense being that he did not know he was signing a note because of the fraud of the payee. The court affirmed the judgment of the lower court based on the latter's finding that the maker was negligent. After expressly stating that it did not pass upon the question of whether the defense was real or personal, it proceeded nevertheless, to state that it was not a real defense. For the reasons appearing above that dictum is disapproved.

Plaintiff contends that the evidence is not sufficient to support the findings and judgment.

Each of the documents involved in the transaction consisted of a single sheet of paper containing three instruments separated by perforated lines. Each instrument was signed. The first was an application for credit setting forth a general outline of house repair work which was to be done by Home Improvement Company, the payee of the notes. Next were the notes followed by a certificate that the work had been completed. Plaintiff, purchaser of the notes took the entire

documents. Home Improvement Company, payee, was a contractor engaged in house repair work. In the first document the application for credit was dated March 15, 1941, and the note, in the principal sum of $628.93, and the certificate of completion, were dated March 19, 1941. Plaintiff purchased the note on the latter date. In the second document the application was dated March 20, 1941, and the note, in the principal sum of $288.50, and the certificate, were dated March 26, 1941. Plaintiff bought the note on the latter date. The notes were payable in installments commencing 60 days after date and were for repair work to be done by the payee, apparently under a contract between the payee and defendants. The work was not done satisfactorily.

Mr. William Hart, an agent of payee, called upon defendants to solicit repair work for Home Improvement Company, being introduced by a Mr. Krajcr, an intimate friend of defendants. Unknown to defendants, Hart had arranged with Krajcr to obtain customers for Home Improvement Company for which he was to receive a commission. After examining defendants' houses where the repair work was to be done (Hart jotted the nature thereof down in a note book) defendants, Krajcr and Hart, and two men accompanying the latter returned to defendants' home where Hart prepared the documents, and told defendants to sign them. Defendant, Mrs. Panac, replied that: "I sign when work is done," I said, "When work is done, I sign. Another things, if you sign, I don't know where to sign." *I couldn't read it. I read very little.* THE COURT: Do you read English? A. *Little, very little,* because I have my Constitution, that is all. I just learn just a little bit for the Constitution. THE COURT: Do you mean citizenship? A. For citizenship, that's all, and I never know my name . . . imagine how much I could know, and . . . THE COURT: Can you write? A. I can sign my name. THE COURT: Can you write? A. (Cont.) But I don't know how to spell. I can copy but I couldn't spell the things. So anyway, why he . . . Oh, well, he wants to write all this. I say, "Well I tell you what you do, leave the paper here and I show the lawyer," and then "Oh, no," he said, "You got to sign. I tell you why, tomorrow I have to send a man here. Don't you want the work done?" I said, "Yes, sure enough, I want the work done, but I have to see," and Martin (Mr. Panac) was joking, and I said, "Martin, don't joke . . . don't joke Martin, he wants me to sign, I don't want to sign."

He says, "Oh," he says, "The reason I want sign is because I got to start the work." Martin says, *"I trust you, Hart."* . . . A. Well, after he (Hart) written then Martin, my husband, say "O.K." Mr. Hart, he says, "I kind . . . I have recommended and I see you was in the war," . . . he tell he was in the war, and I believe it, so he said, *"I trust you."* He said, "I going to sign." THE COURT: Then did your husband sign? A. He sign and he make me sign. THE COURT: And you signed too, all right. A. And before I sign, I say, *"I don't know how to read."* "I read it to you," so he read what got to be done . . . A. Mr. Hart read it. THE COURT: Did he read it over? A. He read it over and he say, everything's on the paper. THE COURT: Did you understand what he was reading? A. Yes, I understand what he reading, says, "The hardwood floor," and all the things what he repeat, why I understand that. Then there was a note on the bottom. THE COURT: What color was the paper you signed? A. White paper. THE COURT: You never signed any blue paper? A. Only mine. After. THE COURT: I mean at that time? A. At that time no, no blue paper. THE COURT: All right. A. And before I sign, I say, "Still, I don't want to sign no paper." He (Mr. Panac) says, "Listen, sign Emelia," he says, "You see if he do something wrong, you see that leg," he said, "crippled." He said, "I make another leg a cripple." Really he did say that, so I feel embarrassed, and so I sign, and I thought he give me this, and I say, "Give me this paper what I signed." He said, "Oh, no, I give you another one," and *make me sign the other blue paper.* He never leave me that one. . . . Did you sign those blue ones to your recollection? A. No, no. I sign the white one, and he give this little piece to me. I asked for the other, and he said, "Oh, no," so he take that case, and just spread it out down there and keep it up. THE COURT: All right, *did he read that blue one to you?* A. No. THE COURT: Just read the white one? A. The white one. Q. Did that say anything about repairing of the roof on the things he read to you, or do you know? A. Yes, repair the roof. Q. That's what he read to you? A. Yes, and the hardwood floor and the ventilation. . . . Q. In other words, Mrs. Panac, he read to you the things he had written down in the black book (the note book in which Hart jotted down the repairs to be made)? A. Yes. Q. And stated they were in the contract? A. Yes." (Italics added.) It appears that the white paper

was the contract for the repairs and the blue one the document in question. She also testified: "Q. Well, your testimony, Mrs. Panac in that respect is, that you didn't understand you were signing the promissory notes, or you weren't signing, so far as you knew, any certificates of completion of jobs; you didn't know you were signing any applications for loans; you hadn't contemplated any loans of any sort whatsoever; you signed some big white paper that you thought was a contract for certain work to be done which would be paid for sixty days after completion. A. Yes. . . . Q. How well do you read English, Mrs. Panac? A. Well, I couldn't read very good. Oh, I couldn't read it. I don't know how to spell or anything. Just I learned the Constitution by myself. . . . THE COURT: Do you drive an automobile? A. Yes. THE COURT: How can you read the signs? A. Yes, I can read the signs because I learned later for the Constitution. THE COURT: But the signs, what has that got to do with the Constitution? A. Yes, I can read the signs, because it is big, you know. THE COURT: You memorize it, do you mean? A. Yes. Q. Do you mean the stop sign? A. Yes, stop sign and signals and everything. THE COURT: Do you read the newspaper at all? A. No, I never take it because I know I couldn't. Q. Did you sign these papers that were signed here, or sign anything that night of March 15th, immediately it was presented to you, or did you ask for independent advice before you signed it, or an opportunity to read it? A. Well, I ask him to read it. First I told him I wanted to show my attorney. "Leave this paper here?" He says, "Oh," he says, "I read for you." I said, "I couldn't read or write." He said, "I'll read it to you." THE COURT: How many papers did he read to you, 1, 2, 3? A. One. THE COURT: Just one? That is all he ever read to you? A. Yes. THE COURT: Do you know what a promissory note is? A. No, I don't know. Q. Did you know you were signing any promissory note? A. No. Q. Did you desire to borrow any money at that time from the C. I. T. Corporation or anyone else? A. Not a thing, no, sir. THE COURT: Well, what did you think you were signing? A. Well, sign because he said he couldn't start to work and the reason he said, "You have to sign it, because he couldn't start to work, he have to send the men to do the work." Defendant Mr. Panac testified: "Can you read Mr. . . . A. Well, not much, I may read a little but I can't pronounce it well, so

afterwards he says, "Well," I told him (Hart), I said, "Read now to me what you got in your contract." Well, he read it to me. . . . O.K. then when he read that contract to me, he says, "Now you sign it." I says, "Now listen, how can I sign it when I don't know what you are doing?" Oh, he says, If you don't sign. . . . If I don't sign it, he can't start the work. There was nothing mentioned about financing or anything else, and he said I had 60 days time to think this matter over. THE COURT: How many papers did he read to you, one or two? A. One paper he read to me, only one. . . . THE COURT: Is it possible that you signed more than once on each paper? A. Well, I couldn't say "Yes" or "No." I know I signed two papers, not five or six. THE COURT: Do you know what a promissory note is? A. No. . . . THE COURT: Well, I don't care anything about that. Well, did you know you were signing any promissory note? A. No, I didn't know. I know that the job supposed to be done, what I told him to be done, what kind of job, that's all, but the other I didn't know, and I didn't know anything about money because he told me I have sixty days time to think it over where I can get the money but how . . . but he told me not to worry about it. . . . THE COURT: Mr. Panac, can you read this? Just put your glasses on. Can you read this? A. (Reading) "Notice to be borrow. Do not sign this until the work is satisfactory completed." THE COURT: Do you know what that means? A. Well, that means. . . . but he didn't read that to me. THE COURT: Well. . . . A. That means I shouldn't pay the money or anything until the work is complete. THE COURT: What does the word "sign" mean. That is "sign"? A. Yes, "sign," that means sign my name. THE COURT: "Do not sign?" A. Yes, "Do not sign until the work is complete." THE COURT: Well, what does that mean? A. That means I shouldn't sign it, but I wasn't on that . . . I was . . . for not to start the work because . . . for me not to start work until I sign it. THE COURT: Did you see this? A. No, I didn't see it. THE COURT: Didn't see it? A. No. No. No such a thing. If I did see that I could say, "Well here, it says not to sign until complete work, and you want me to sign it and there is nothing started. . . . Q. Did you impose trust and confidence in Hart because of Krajer? A. Well, yes, because I asked him. . . . I said, "How is the job going?" He said,

"Well, he guarantee the job." "Then the way Hart told him, he said it going to show up so they have the neighbors, or people whoever been living in there, ask who done this work." I said, "Yes, if you do this work all right, you will get the customers to do more business." He said, "Oh, he try to do his best, but afterwards when they didn't start to work for six weeks, . . . for a month or six weeks, then I was dis· gusted. Q. Martin, how did you happen to. finally sign any thing at all? Did you make some statement to Hart just before you signed everything? Was your wife demurring or refusing to sign? Yes, she did. Q. How did she happen to sign? A. How happen to sign, because I told myself, "I want you to sign." No, he said he can't go ahead with the work unless I sign it, but there was no . . . nothing in my mind, anything about money, because when he told me about sixty days I have time to make up my mind, about the money, and forget it, not to worry about it. Q. What did you say to Hart just before you signed the contract, anything at all? A. I asked him, I said, "Now this work got to be done, what you have. He said, "Yes, yes, everything . . . no worry about it." That's why after I sign, I said, "Well, if you can't start work without the signature, I can't delay and so on with the job. It don't do no good, might just as well start right away." "He said he will, and it was about month or six weeks before. Q. Wait a minute. Did you know what you were signing? A. I know *just for the job.* Q. You were signing a contract for the job? A. Yes, for the job. Q. Were you and your wife hesitating about signing it, for a while there that night? A. Yes. Q. What did you finally say to Hart just before you signed it? A. I told him, "What is this paper?" I asked him, "What's this for to sign?" He said, "We can't go ahead with the job." . . . Q. Do you remember any discussion about Hart's bad leg? A. Yes. Q. What did you say about that, Anything? A. Yes, I said, "Now you got bad leg and if you don't come through with what you say, you are going to do good work, and so on, I get the other one." Q. That was before you signed the contract? A. Yes. Q. And that was the reason you signed the contract? A. No, not that, but the reason was this: If he don't do the right work the way he promise this and that, and not to worry, I be surprised on how the work is going to be done, I said, "All right, but listen, you have one bum leg, but if you don't come through with all you

promised, you have the other leg bum." . . . Q. By the way, just one other question: What kind of a fellow was Mr. Hart to you, very cordial, very nice? A. Yes. Q. Lovely sort of a man? A. Oh, my, if somebody wanted to sell you something, talk like that, you sure buy it. THE COURT: Good salesman? A. You sure buy it. Q. You thought he was your best friend I guess? A. Best friend, and he told me all about what he was in the war, this and that. He said, "You think I'm not going to do for my companion work like that." He don't want to show up anything like that. I said, "Now, listen, you got one leg broken, but I going to break the other one if you don't come through." Q. A couple of buddies, war buddies, huh? A. That's what I told him. He says, Oh, no, no, no, nice, nice, nice, and the two men that was with him, . . ." In corroboration of defendants Mr. Krajcr, who was present at the signing of the notes, testified that Mrs. Panac was reluctant to sign, but Hart told her the work could not be commenced unless she did; that Hart read only one paper to defendants; that he did not hear any note read. Mrs. Krajcr testified that Mrs. Panac could not read English very well and she read things for her. Mrs. Panac's daughter testified that Mr. Panac did not read very well and requested her on various occasions to read written instruments for him.

We believe that the evidence is sufficient to support the findings. While there is some conflict in the evidence it is clearly sufficient. From an examination of the record it is apparent that the trial court could have concluded, as it did, that defendants did not have an understanding of the English language. The trial court was in the position to observe the witnesses and we cannot say that it was unreasonable in determining that the defendants were illiterate. Illiteracy is largely a matter of degree and must be considered in the light of the subject matter to be read or understood. The evidence is clear that Hart read the contract for the repair to defendants but not the documents containing the six instruments including the notes. Defendants did not know they were signing promissory notes or certificates that the work had been completed when it had not even been commenced. The evidence does show that defendants knew that they were to have time in which to pay for the repair work, but it is clear that they did not know they were signing a negotiable instrument with results which follow from its negotiation. That defend-

ants would not have signed it if they had known they were signing notes and certificates of completion is a reasonable inference from the foregoing. From the events that occurred and the conduct of defendants it may be inferred that Hart knew of the illiteracy of defendants. Manifestly, he was using "high pressure" selling methods upon persons who would appear to be easy victims. The whole tenor of the transactions shows fraud upon his part.

■ The trial court was also justified in finding that defendants were not negligent. Particular mention may be made of the illiteracy of defendants, the high pressure methods pursued by Hart, the reading of only the contract for repairs and not the notes, the insistence by Hart of an immediate execution, and Hart's brushing aside Mrs. Panac's suggestion that advice and particularly legal advice be first obtained. It is true that there were other persons present when the notes were signed but two of them were presumably friends of Hart. Krajcr was also present but it is clear Hart was using him to perpetrate the fraud through the friendship existing between defendants and him and the commission to be paid to him. The presence of Krajcr and his apparent acquiescence in the transaction served to silence any apprehensions of defendants. Under all of the circumstances we cannot say as a matter of law that defendants were negligent. It has been said with reference to the maker's negligence in cases such as the one at bar:

"It is impossible to state any general rule as to what acts or conduct of defendant will amount to such negligence as will permit a recovery in the cases now under discussion, since, as will be seen from an examination of the authorities, the different courts have taken very widely different views of the subject. As discussed in section 703 of this Title, negligence is generally a question for the determination of the jury, all the facts and circumstances of the case being considered, but, where a state of facts is admitted or not disputed, negligence may exist as a matter of law. The jury may take into consideration, it would seem, the age and mental and physical condition of the person signing, as well as mercantile usages of trade and commercial intercourse as to negotiable paper.

"It has been decided in a number of cases that, where it appeared that defendant who was a person possessing ordinary faculties and able to read and to write signed an instrument

without reading it, or being unable to read made no effort to inform himself of its character or contents by having it read to him, trusting entirely to the representations of a stranger, a bona fide holder might recover; but this rule is not universal in its application and would not apply, it seems, to fraud in the inception of the note. The fraud which will relieve a party who is capable of reading must be a fraud which prevents him from reading.

"Persons who are easily defrauded because of age, infirmity, or ignorance are, as would be expected, usually defendants in cases of this character, and whether or not they are negligent depends on the facts and circumstances of each particular case, the ignorance of infirmities of such defendants being taken into consideration. Accordingly, the fact that a party whose signature is obtained by a fraudulent representation that the instrument is of a different character from the one that he believes he is signing is an illiterate person is material when such fraud is pleaded as a defense in an action against a bona fide purchaser. The maker or the acceptor must, however, have been guilty of no negligence and must generally have taken advantage of such reasonable means as lay at his hand. Some cases would seem to establish the rule that one who cannot read is negligent in trusting to the representations of the other party to the transaction as to the contents of an instrument which he signs, where he can easily procure the instrument to be read by third persons who are known to him. However, a person who cannot read is not always negligent in not calling on a third person to read the instrument to him, the question as to his negligence generally being one for the jury, as discussed in section 703 of this Title." (10 C.J.S. Bills & Notes, § 499(b), p. 1100.) (See, also, 11 C.J.S. Bills & Notes, §§ 702-703; 8 Am.Jur. Bills & Notes, § 1137; Daniel on Negotiable Instruments, § 996.) *Bedell* v. *Herring, supra,* is not controlling on the issue of negligence. While some of the factors present in the instant case existed in the Bedell case, not all of them did, and the court was affirming a finding that the maker was negligent on an appeal on the judgment roll alone.

For the foregoing reasons the judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.