## LEWIS v. KITZEN, et al.

Circuit Court, Broward County.

March 23, 1956.

Maurer, Maurer & Maurer, Fort Lauderdale, for plaintiff.

James D. Welch and Harry D. Boswell, both of Fort Lauderdale, and Salter & Zuckerman, Hollywood, for defendants.

JAMES H. WALDEN, Circuit Judge.

Set forth in full below is the report of Boyd H. Anderson, Jr., Esq., special master in chancery—

The undersigned appointed as special master on February 7, 1955 respectfully advises the court that he sat as special master in

the above cause (pursuant to an order entered March 29, 1955 extending the time for taking of testimony) on April 20, 1955 in the Broward County courthouse. The parties and their counsel were present, the plaintiff represented by W. F. and David E. Maurer, the defendants by Harry D. Boswell from the law office of James D. Welch. After swearing the witnesses and taking the testimony and evidence of the parties and their witnesses as shown by the transcript of testimony filed herein, I report the following as my findings, conclusions and recommendations based on the evidence then presented—

## Pleadings

Plaintiff filed her complaint and several amendments thereto in which she charges defendants with attempting to defraud her of her money and property, and with civil and criminal usury, in the obtaining of a note and mortgage on her homestead in an amount far in excess of the proceeds of the loan, and at an exorbitant rate of interest. She further claims fraud was practiced on her in that she was not aware of the nature of the instruments she was signing nor of their content, and that the mortgage was for a greater principal sum, greater interest and on terms different from those stated to her by defendants' representatives. She further charges that the mortgage did not comply with the statute of frauds in that the witnesses and notary public who attested and before whom it is recited she acknowledged her signature were not present at the time of execution of any instruments by her. Plaintiff avers she was thus taken advantage of, and that this was possible because she is an ignorant, almost illiterate colored person who had to rely on defendants' representatives for fair and honest treatment.

Defendants deny all the material allegations of the complaint, allege they received the note and mortgage and that same were executed by plaintiff, freely and voluntarily and without any fraud on their part. They deny violation of the usury statutes.

## Admissibility of Certain Evidence

One of the evidentiary exhibits presented at the hearing, the loan application from plaintiff to Mortgage Broker, Inc., defendants' exhibit for identification #3, is not in the court file nor with the transcript of testimony, although an alleged copy is attached to defendants' brief. It is suggested that the attorneys for the parties search for this exhibit and file same in this cause if it is found.

I find that the mortgage closing statements, plaintiff's exhibit for identification #9, so marked pending my ruling as to its admissibility, which was withheld at the hearing, should be admitted in evidence as plaintiff's exhibit #9. Defendants' sole objection was as to materiality (Transcript page 97). I have determined that the exhibit is material, see 20 Am. Jur., page 289, the authorities cited by plaintiff, and below.

I further find that defendants failed and refused to comply with the order of the court entered December 4, 1954 granting plaintiff's request for production of documents, including in paragraph 1 a request for the closing statement for the loan made by defendants to plaintiff, and directing defendants to—"comply with said request by exhibiting said material to plaintiff's attorney within 10 days from date hereof, and permitting plaintiff's attorney to make copies thereof."

Defendants filed their answer to this request on December 14, 1955, stating—"In answer to paragraph 1 that they purchased a note and mortgage through a broker, that all they have in their possession are the mortgage, note and canceled check. They did not prepare a closing statement and did not receive one."

At the trial both defendants admitted they employed the attorney, Irving F. Kalback, who prepared the closing statement and closed the loan for them (Transcript pp. 128, 133, 154, 155). This attorney has had copies of the closing statement this entire period of time (T. 142 et seq.)—the statement was thus under the direct control of the defendants, who could have produced it. I recommend that the court invoke the penalties prescribed by section 1.31 (b) (2) (ii), 1954 rules of civil procedure, denying defendants the right to introduce this statement, or any testimony relevant thereto, in evidence in this cause.

*Findings of Fact*
*and*
*Conclusions of Law*

I find that the following facts have been proven by a preponderance of the evidence carefully weighed and considered—

In March 1954 plaintiff owned her homestead in Fort Lauderdale on which was situated a small duplex house and her small restaurant. Her property was encumbered by a first mortgage to the Broward National Bank in the original principal sum of $1,687.88, which had in March 1954 been reduced to $1,265.58 by regular monthly payments.

At this time a salesman for All State Construction Co. (hereinafter sometimes referred to as "the construction company") approached plaintiff and convinced her that she needed jalousies in every outside opening in the duplex. The testimony is in conflict as to whether the price quoted was $1,485, $990 or $900 for this work—but plaintiff agreed to have it done.

The salesman then called Peoples Mortgage Corporation (hereinafter sometimes referred to as "the mortgage company") to set in motion the machinery which resulted in plaintiff ending up a few days later obligated on a $4,000 first mortgage on the property payable to defendants.

Plaintiff did not realize what had happened until, after making several efforts to learn the amount and dates of her payments, she in desperation contacted her attorney who uncovered the above and other facts set forth below, and at her request promptly instituted this suit asking that the mortgage be declared a nullity due to fraud and the violation of section 687.07, Florida Statutes 1953, relating to criminal usury, or in the alternative the infliction of the penalties prescribed for the violation of section 687.03.

I further find—

*That the mortgage company and attorney Kalback were the agents of the defendants, not the agents of the plaintiff as contended by defendants for the purpose of representing defendants, placing loans for defendants, of defendants' money at the highest possible rates of interest.*

*That defendants (together with other principals and clients of the mortgage company) as lenders, the mortgage company as agents, the construction company as contact men and contractors and Kalback as attorney worked in concert, comprising a conspiracy ultimately resulting in the defrauding of the plaintiff and the committing of usury.* While there is insufficient evidence to establish their membership in the conspiracy, it appears that Rein Insurance Agency, as insurance agent, and James D. Welch, attorney, also worked closely with this group.

The facts relied on as establishing the above two findings are as follows—

The defendant Kitzen identified the mortgage company as the chief one of several *"agents"* who give him mortgages (T. 122).

The head of the mortgage company, Murray Beck, referred to the defendant as their "client" (T. 90) and apparently as their

"principal" (T. 104) (since they specifically said they discuss their fee with the borrower) and transcript page 106 in an unguarded moment.

Beck also testified that the defendants are one of a group of 75 to 100 mortgagees "that we place mortgages for" (T. 92).

His co-employee, Lawrence Beck, stated (T. 115) that they have the people who want to loan money.

Defendant Kitzen and the mortgage company have done business together for the past 2 or 3 years (T. 121).

Defendant Kitzen attended one of the mortgage company's parties. (T. 141).

The mortgage company advised plaintiff that she could return the $503.30 (which she had not requested, but which was added to her loan and disbursed to her for some unexplained reason) to either themselves or the defendants (T. 58). Plaintiff, after attempting to forward same to defendants did return the check to the mortgage company for which she received a receipt (plaintiff's exhibit #6) and proper credit on her mortgage balance (T. 124).

The construction company, the contractor on plaintiff's house, mailed a $500 refund, which they elected to return from the $1,485 originally paid them by defendants' attorney, back to the mortgage company rather than to defendants or their disbursing attorney (T. 38).

The mortgage which is the subject of this controversy which was apparently prepared by defendants' attorney (T. 134) was marked to be returned from recording to the mortgage company (plaintiff's exhibit #2).

Attorney James D. Welch has apparently been involved in a number of similar transactions involving the mortgage company and their lenders and Kalback and the construction company wherein loans for colored persons (T. 114) were closed in his or his office associate's presence—see some eleven of the mortgage closing statements, plaintiff's exhibit #9, in which Welch or his associate appear as witnesses, and several more closing statements before the same notary public, presumably an employee of their office.

Through her testimony and gestures at the hearing plaintiff indicated Welch's office as the place where she signed the mortgage and some other documents relative to this cause, at which

time she was advised by a large white man who smoked a cigar that "We're all one big family" (T. 49, 50). Welch's office which was then (and is in this suit) representing the defendants Kitzen and Kaplan clearly has not at any time represented the plaintiff. Strangely, the evidence is uncontradicted that the colored notary and witnesses whose names appear on the mortgage as attesting to plaintiff's signature were not present in Welch's office when plaintiff executed the mortgage (see below).

While Lawrence Beck testified that the mortgagees use their own attorney to close the loans (T. 118) it is peculiar that all of the mortgage company's 75 to 100 mortgages have identical tastes, it also appears that all of their loans are closed by Kalback (with many closing statements witnessed by Welch or his associate as aforesaid) who examines all titles and insures them for all the mortgage company's mortgage clients (T. 101, also see plaintiff's exhibit #9). Kalback and the mortgage company are clearly working with one another, and with the defendants and their other lenders.

The defendants employed the same attorney, Kalback, in handling this and similar transactions for them (T. 128, 154). Defendants appear to have relied heavily on Kalback and given him broad authority in handling this and similar matters (T. 133, 154, 155). This attorney advises them regarding the mortgages they contemplate making and defendant Kitzen, at least, maintains a running account with him for the making of loans—the attorney making collections for Kitzen on his mortgages, deposits these collections into this account, from which he disburses money for the making of new loans and mortgages for this defendant (T. 127).

It is interesting to note that in every mortgage closing statement (plaintiff's exhibit #9) prepared by Kalback in which the insurance agent was named, the Rein Insurance Agency was paid the disbursement for property insurance. (This smacks of violation of section 627.92, Florida Statutes 1953). Unfortunately no testimony was taken as to whether property insurance on all loans is placed with this agency by the mortgage company or Kalback, or whether the Bernard Rein (listed by defendants in their answers to interrogatories as a person having knowledge of relevant facts), whose address is given as c/o Peoples Mortgage Corp., is "the" Rein of Rein Insurance Agency. While the master has ruled that defendants' exhibit #1 and testimony relevant thereto be ruled inadmissible, nevertheless in the event the court should admit said testimony it might be well to note that once again Rein Insurance Agency is alleged to have issued a policy on plaintiff's

property—even though plaintiff was carrying a $4,000 fire and extended coverage policy on the mortgaged premises, which policy has been in effect for several years, is still in effect and apparently was placed at a substantially lower cost to plaintiff (T. 10, 11, 12), and defendants' agents were so advised (T. 60, 84).

The construction company has apparently been the moving factor in bringing the mortgage company and their lenders to prospective borrowers in a large portion of the transactions represented by the closing statements in plaintiff's exhibit #9 (T. 114, 117) and was the moving factor in the present transaction (T. 30, 89).

The facts indicate that the construction company enjoys a favored position, as lending transactions go, because attorney Kalback disbursed to them $1,485 in payment for their work, seemingly without even a question or requirement as to showing of any contract or otherwise requiring them to establish the contract price (now stated by them to be $990)—a most curious situation in the disbursing of supposedly escrowed funds.

Significantly, Mr. Delvin of the construction company made no attempt to assist plaintiff in increasing her loan at the Broward National Bank (where she was charged only 4% discounted interest and where her credit was already well established) in order to obtain funds for these improvements, yet it is an almost inescapable conclusion that the bank would have granted such an increase, since simple mathematics tells us that her original mortgage loan there was approximately $1,687.88 (T. 23, 24) and had been reduced by over $400. It is almost a certainty that with the value of her property being increased by the improvements and with the total value of the buildings on the land established at $8,000 without any value being placed on the lots (T. 130) any reputable lending institution such as the Broward National Bank, having a customer with an established line of credit, would have been willing to increase the first mortgage, or grant an FHA Title 1 loan, to cover the cost of these jalousie improvements to the property.

The foregoing leads to but one conclusion, namely, that the contractor (the construction company) was in fact furnishing improvements to plaintiff's house of a value of only $600 as stated in its signed application for a building permit (plaintiff's exhibit #1) and thus could not assist plaintiff in increasing her loan at a reputable lending institution in order to obtain $1,485, or even $990, or $900 for this work—because a reputable institution might well investigate the value of the work before approving the loan.

So the company steered the plaintiff into the web of conspiracy above described where each member, beginning with that company might "take a cut" and leave the plaintiff (and similar unfortunates) foundering behind a $4,000, 10% interest bearing mortgage, where otherwise her maximum obligation at a reputable lending institution would have been $2,200 or $2,300 at a lower rate of interest.

It is true that in the instant case plaintiff was at least frugal or intelligent enough to realize that she had not requested the additional $503.30 which was given her without explanation (T. 57, 66) and that it was not a gratuity to be thrown away, as many of her race in her position would in all probability have done. Instead she finally succeeded in having it credited to her account, thus reducing her obligation to approximately $3,500.

This $503 item, together with the payment by defendants of a Title 1 FHA loan of plaintiff's at the Broward National Bank, which was not a lien on plaintiff's property (T. 22, 23), raises another aspect of the matter which should not pass unnoticed. What reputable lending institution will arbitrarily add a large sum of money to a proposed loan just to increase it to the maximum figure which can be lent on the security, or make it come out to a "round figure?" It is common knowledge, of which the master takes judicial notice, that reputable institutions require a good and valid need of the borrower for funds before they will lend— even to good credit risks—and they certainly do not insist that the borrower take a loan equal to 50% of his security just so they may collect interest on a large amount or calculate and pay for "broker's" commission, title insurance, and property insurance on this larger amount. And yet a cursory examination of the mortgage closing statements (plaintiff's exhibit #9) will reveal that the colored people (T. 114) who secured these loans from this conspiring group wound up with a large sum of cash in their hands in a surprisingly large number of cases. (This money was not used by them to pay other debts (T. 107). What purpose other than that described above could it have had?)

In making the above findings the master has not been unmindful of the testimony of the defendants and their witnesses, but considered their demeanor and their testimony in the light of the documentary evidence and uncontroverted facts in weighing it and arriving at the above conclusions. It is also observed that at least certain of defendants' witnesses are "cagey" and experienced in giving testimony in similar situations, as evidenced by their

demeanor and the reported cases. For example, see Carey v. Peoples Mortgage Corp., 4 Fla. Supp. 37; Mindlin v. Davis (Fla.), 74 So. 2d 789.

"Agency may be inferred from the related facts of the case, or implied from a prior course of dealings." 1 Fla. Jur., Agency § 6, citing 2 Am. Jr., Agency § 23, Quinn v. Phipps (Fla.), 113 So. 419, also 2 C. J. 439. See also Stuyvesant Corp. v. Stahl (Fla.), 62 So. 2d 18, and 2 Am. Jur., Agency §§ 24, 25.

"Generally speaking, whatever evidence has a tendency to prove agency is admissible even though it may not be full and satisfactory. Direct evidence is not indispensable; circumstances may be relied upon, such as the relation of the parties to each other and their conduct with reference to the subject matter of the contract. Although the alleged principal and agent are the only witnesses called, and they both categorically deny the existence of the relation, the jury may weigh and consider the whole evidence and draw fair and reasonable inference therefrom, and may be entirely justified in disregarding the 'yes and no' answers and in reaching the conclusion that the evidence as a whole is sufficient to prove the relation of agency." 1 Fla. Jur., Agency § 8, citing Watkins v. Sims (Fla.), 88 So. 764, approved in Standard Oil Co. v. Nickerson (Fla.), 138 So. 55. See also 1 Fla. Jur., Agency § 53.

"A 'conspiracy' is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Gaines v. Malone (Ala.), 13 So. 2d 870, 11 Am. Jur., Conspiracy § 3.

"Thus, the proper rule is expressed as follows—All such acts that have the necessary tendency to prejudice the public or to injure or oppress individuals or unjustly subject them to the power of the conspirators are sufficiently tainted with the quality of unlawfulness to satisfy the requirements as to conspiracy." 11 Am. Jur. Conspiracy § 10.

"Conspiracies need not be established by direct evidence of the acts charged. They may, and generally must, be proved by a number of indefinite acts, conditions and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused which are committed in pursuance of an apparently criminal or unlawful purpose in common to them. The existence of the agreement or joint assent of the minds need not be proved directly, but may be inferred by the jury from other facts proved. It is not necessary to prove that the defendants came

together and actually agreed upon the unlawful purpose and its pursuit by common means. If it is proved that the defendants, with a view to the attainment of the same purpose, pursued such purpose by their acts—often by the same means, each performing some part thereof—the jury will be justified in concluding that they were engaged in a conspiracy to effect a common object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty. His participation in the conspiracy may be established without showing his name or giving his description." 11 Am. Jur., Conspiracy § 38.

"To establish liability for a conspiracy, it is sufficient if the proof shows concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt act was committed in furtherance of a common design, intention and purpose of the alleged conspirators. In other words, circumstantial evidence is competent to prove a conspiracy . . ." 11 Am. Jur., Conspiracy § 56.

Plaintiff contends that the mortgage (plaintiff's exhibit #2) is a nullity in that it was not executed in the presence of the two attesting witnesses nor did she appear before a notary public and acknowledge her signature, contrary to the notary's certificate. Her testimony is uncontradicted to the effect that while she knows the two witnesses and notary who signed the mortgage neither of them was present at the time she signed the document which she now believes was the mortgage. (T. 48, 50, 51, 54, 63). It is asserted on her behalf that the execution of a mortgage must be carried out so as to comply with the statute of frauds, section 689.01, Florida Statutes 1953, despite Walker v. Heege (Fla. 1920), 83 So. 605, to the contrary because the statute has been amended since the date of that decision to require the compliance *instrument* rather than *deed* in the former law. In the opinion of the master, however, it is unnecessary to decide this question here since the law seems clear that if the mortgage is otherwise valid, then as between the parties it will be given effect in equity as a mortgage regardless of a formal defect in its execution. 59 C. J. S., Mortgages, § 115; 36 Am. Jur., Mortgages, §§ 91, 113.

Plaintiff also contends that the mortgage is a nullity because of fraud in procuring its execution in that she was given the impression that it would be for a total amount of $900 plus the sum of $1,375.85 necessary to pay the bank and no more (a total of $2,275.85) and that it would carry interest at 7% and would be repaid at $75 per month over a 3 year period, rather than the $4,000 10% note and terms ultimately contained in the mortgage

and note, and she states that she was misled into believing that she was only to sign papers relative to completion of the work, so the contractor could get his money (T. 69).

See Annotation, 100 A.L.R. 1295; Lewinson v. Frumkes (Fla.), 64 So. 2d 321; U. S. v. Costello (N. M.), 120 F. Supp. 522; and C.I.T. Corp. v. Panac (Cal.), 154 P. 2d 710, holding similar facts a good defense in the absence of negligence on the part of the signer. In the case at bar, however, plaintiff indicated an ability to read words and figures (T. 52) to the extent that she should have been able to read the words "Mortgage Deed" and "Mortgage Note" appearing in larger type on the instruments and the typewritten portions of the note in order to become aware of what she was executing. Further, she apparently did not question the two men who were there in attorney Welch's office (one of whom was a lawyer) regarding any particulars of the transaction, nor ask to have the instrument read to her (T. 52, 66), nor was "anything there explained to you" (T. 66). In my opinion plaintiff was not entitled to rely solely on an informal telephone conversation, apparently with the attorney's secretary, as to the purpose of coming to the attorney's office to sign papers, in asserting that she was misled as to the character of the instruments which she signed. In not making inquiry or attempting to read same herself, and not having them actually misrepresented to her at the time of their execution by either of the persons present, she is the victim of her own negligence so far as their execution is concerned—and if the mortgage and note were otherwise valid would be obligated thereon.

Her final contention is that defendants are guilty of violating sections 687.03 and 687.07, Florida Statutes 1953, pertaining to civil and criminal usury. The various issues raised with respect to this contention will be separately considered.

Defendants claim that the entire $4,000 proceeds of the loan were disbursed to plaintiff or for her benefit and attempted to introduce the loan closing statement and testimony of Kalback's associate to prove it. Under rule 1.31 (b) (2) (ii) the admissibility of such evidence is within the province of the court as aforesaid—but in my opinion, as will appear below, the outcome of this case will be substantially the same regardless of the court's ruling on the question of admissibility.

One of the points of dissension regarding the matter of usury is the sum which defendants are to be credited as a payment to the construction company, for the benefit of plaintiff. Mr. Delvin

of that company concedes that the $1,485 payment which he received from defendants was in error and he now states that the true contract price was $990 (T. 29, 31, see also 70, 71, 75, 76). Consequently he returned $500 to the mortgage company (T. 38).

There is no showing that plaintiff ever received this sum nor that it was credited to her account, and plaintiff expressly testifies that she has not received same (T. 67). She asserts that the contractor's price was only $900 plus a reasonable sum for an additional canopy (T. 43, 45, 75) established at $59.71 including tax (T. 7) by uncontroverted testimony. Delvin insists that the price was $990 including the canopy (T. 32). Plaintiff also testified that the work was never completed in that the company failed to install or furnish the two jalousie doors on the rear of the house as it had contracted to do (T. 44, 45, 69). He merely states that he does not recall this (T. 32), but does not produce the contract or any evidence directly controverting plaintiff's testimony.

I find that the contract for installation of the jalousies did call for the installation of 4 jalousie doors and that only 2 were installed and this fact was made known to defendants (T. 69, 72). I further find that as one of the co-conspirators the construction company's dealings with plaintiff should be closely scrutinized and that the defendants should be entitled to credit for only a fair and reasonable sum paid to that company for the improvements made and necessarily the contract price. Insufficient evidence, however, was presented to determine this sum with accuracy and it is not necessary to do so now, since even if we give credit to Delvin's statement establishing the contract price at $990 including the canopy we must subtract from this the value of 2 doors established by uncontroverted testimony at $56.80 each or a total of $113.60 (T. 5) from this price to obtain the maximum possible credit to be allowed defendants for the payment due All State Construction Co. of $886.40. (If it were necessary to decide between plaintiff's and defendants' contradictory testimony as to the contract price, all indications would, in the master's opinion, favor the plaintiff's version).

I further find that because Kalback and the mortgage company were the agents and co-conspirators of the defendants (see findings above) they acted in this transaction on behalf of and for the benefit of the defendants—and not for the plaintiff. Plaintiff was not advised of and made no agreement to pay for any attorney fee, brokerage or other expenses (T. 45, 61). The mortgage company's brokerage fee of $500 is an exorbitant and excessive charge —based on "what the traffic will bear" (T. 99, 119), contrary to

the spirit of all usury laws which are designed to protect the borrower from having to pay all that he might have to "bear." "The very purpose of statutes prohibiting usury", the Supreme Court said in Chandler v. Kendrick, 146 So. 551, "is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." See also Beacham v. Carr (Fla.), 166 So. 456, 459.

The defendants should receive no credit for any sums paid to Kalback or the mortgage company, if any was paid.

"If procedure, such as was followed in this transaction, were approved by the court the way would be opened for a practical nullification of the provisions of the statute denouncing usury. A person could be at once an attorney at law and an attorney in fact, in the former capacity charging the borrower with a fee and, in the latter capacity, receiving lesser compensation from the lender. A part of his remuneration could therefore be retained by the lender in addition to the maximum legitimate return on the loan and the law against usury circumvented. This thought is suggested from reading the opinion in Richter Jewelry Co. v. Schweinert, supra." Stoutamire v. North Florida Loan Ass'n. (Fla.), 11 So. 2d 570. See also Owens v. State (Fla.), 58 So. 125; Richter Jewelry Co. v. Schweinert (Fla.), 167 So. 750, 757; and Mason v. Cunningham (Fla.), 149 So. 331.

"It is generally held that the exaction of a commission from the borrower by the lender's agent will render the transaction usurious if such action is known to and authorized or ratified by the lender. Some cases, however, seem to make the usurious character of such a charge by the lender's agent, even with the lender's knowledge and authority, depend upon its being unreasonable in amount." 55 Am. Jur., Usury § 77. See also 55 Am. Jur., Usury, §§ 60, 75.

"Although there is some authority to the contrary, authorization such as would render a lender responsible for the exaction of a usurious commission by his agent has frequently been inferred from the fact that there was either an express or an implied understanding between the lender and the agent that the latter should get this compensation from the borrower . . ." 55 Am. Jur., Usury, § 80. (That defendants expected compensation to be paid by plaintiff, the borrower, see transcript, pp. 125, 128.)

"A borrower by contract, either expressed or implied, may agree to pay certain expenses necessary for the preparation of papers and documents, examination of title, and inspection of property, in order to procure a loan, and a reasonable

charge therefor will not make the contract usurious; but, in the absence of an agreement or an understanding to that effect, a borrower cannot be held to pay such expenses, and if he is compelled to do so the contract is thereby rendered usurious." First Nat'l. Bank of Ada v. Phares, 21 A.L.R. 73, 174 Pac. 519.

See also Annotation, 21 A.L.R. 809, 850, 853, supplemented in 53 A.L.R. 743, 63 A.L.R. 823, and 105 A.L.R. 795. See also Williston on Contracts, Rev. Ed., § 1697.

As to lender's knowledge, see above recited facts of the transactions with the mortgage company and the employment and authority of attorney Kalback. Also, 1 Fla. Jur., Agency § 79, page 688 and § 86, page 695.

The defendants are also responsible for the acts of their co-conspirators, Kalback and the mortgage company.

"The connection between the parties having been established, whatever was done in pursuance of the conspiracy by one of the conspirators is considered as an act of all the conspirators; all are equally liable therefor as joint tort-feasors, regardless of whether they were original parties to the conspiracy and irrespective of either the fact that they did not actively participate therein or the extent to which they benefited thereby . . . It is not necessary, in order to establish that the defendants are co-conspirators, to prove that the conspiracy originated with them or that they met during the process of the concoction of the scheme. Every person entering into a conspiracy already formed is deemed in law a party to all acts committed by any of the other parties either before or after his entrance, in furtherance of the common design." 11 Am. Jur., Conspiracy § 48.

Accordingly, defendants should receive no credit for any sums paid their agents and co-conspirators, Kalback and the mortgage company, if any was paid. Further, defendants are responsible and chargeable with the actions of these persons in making any exactions from the plaintiff. Nor are defendants entitled to credit for any sum paid for property insurance, if any was paid, because she had her own policy with a responsible agent in full force and in the amount of $4,000 (T. 10, 11, 12) and so advised defendants' agent (T. 60). No added insurance was required.

I find that the only disbursements of defendants which constitute the actual principal sum received by or for the use and benefit of plaintiff (i.e., the sum of money lent) are as follows—

| | |
|---|---:|
| Paid to Broward National Bank | $1,375.85 |
| Maximum possible sum due | |
| All State Construction Co. | 886.40 |
| Paid to plaintiff | 503.30 |
| Stamps on note | 2.80 |
| | $2,768.35 |

In the event the court should disagree with the master's finding that the defendants are not entitled to credit for any sums paid to Kalback and should admit defendants' evidence showing such sum paid, I find that the maximum fee to which he would be entitled under the rates for mortgage title insurance issued in this transaction would be the sum of $40 which when added to the above would raise the total to be credited defendants to $2,808.35, as absolute maximum.

I find that the total sum which defendants and their representatives have unlawfully charged or accepted of plaintiff by reason of the foregoing is the minimum sum of $1,191.65 ($4,000 note and mortgage *less* $2,808.35 maximum loan, above, leaving a remainder of $1,191.65) charged or accepted from plaintiff directly or indirectly by the above described means, that this sum when added to the 10% interest charge in the mortgage note itself of $1,024.32 (plaintiff's exhibit #3) makes a total sum of $2,215.97 exacted by the defendants, their agents and representatives.

Interest at the rate of 25% per annum charged on the actual sum received (i.e., the sum of money lent) when paid in accordance with the tenor of the note, as calculated in plaintiff's exhibit #4, is approximately $1,974.76. The master recognizes that the calculations in plaintiff's exhibit #3 are based on a slightly different opening balance, but the difference is so small as not to change materially the ultimate figures—accordingly, it has not been recalculated as it is clear that a recalculation would not change the fact that defendants exacted over $200 more than the sum which would have been earned had they charged straight interest calculated at 25% per annum.

A comparison of the above figures and consideration of all the foregoing facts shows that the defendants violated the provisions of section 687.03, Florida Statutes 1953—

*Rate higher than ten per cent unlawful; proviso.*—It shall be usury and unlawful for any person, or for any agent, officer or other representative of any person, to reserve, charge or take for any loan, or for any advance of money, or for forbearance to enforce the collection of

any sum of money, a rate of interest greater than ten per cent per annum, either directly or indirectly, by way of commission for advances, discounts, exchange, or by any contract, contrivance or device whatever, whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of ten per cent, as aforesaid. The provisions of this section shall not apply to sales of bonds in excess of one hundred dollars and mortgages securing the same, or money loaned on bonds.

Defendants also willfully and knowingly. violated the provisions of section 687.07—

*Forfeiture and penalty in case of excessive interest or charges.*—Any person, or the agent, officer or other representative of any person, lending money in this state who shall willfully and knowingly charge or accept any sum of money greater than the sum of money loaned, and an additional sum of money equal to twenty-five per cent per annum upon the principal sum loaned, by any contract, contrivance or device whatever, directly or indirectly, by way of commissions, discount, exchange, interest, pretended sale of any article, assignment of salary or wages, inspection fees or other fees or otherwise, or for forbearing to enforce the collection of such moneys or otherwise, shall forfeit the entire sum, both the principal and interest, to the party charged such usurious interest, and shall be deemed guilty of a misdemeanor, and on conviction, be fined not more than one hundred dollars, or be imprisoned in the county jail not more than ninety days.

"*The courts will closely scrutinize every suspicious transaction in order to ascertain its real nature,*" said the Alabama Supreme Court in Grider v. Calfee, 4 So. 2d 474. "The law is diligent to discern any artifice, device or scheme to cover up usury, in determining whether the contract is tainted with usury, the court will look to *the whole transaction.* Lewis v. Hickman, 200 Ala. 672, 77 So. 46; Dawson v. Burrus, 73 Ala. 111; Uhlfelder v. Carter's Adm'r, 64 Ala. 527. It will consider the surrounding circumstances, the occurrence at the time of the making of the agreement, and the instruments drawn. *The court will look to and construe the transaction by its substance and effect rather than its form,* and if, from a consideration of the whole transaction, it becomes apparent that there exists a corrupt intent to violate the usury laws, the plain duty of the court is to inflict the penalty imposed by the statute." (Italics added.)

### Recommendations

In view of the foregoing findings, I respectfully recommend that the court in its final decree find that the defendants have violated the provisions of section 687.07, Florida Statutes 1953,

and impose the penalty therein prescribed of forfeiture of the entire sum of principal and interest secured by the note and mortgage recorded in official record book 128 at page 56 et seq. of the public records of Broward County, and that said decree direct the clerk to cancel said note and mortgage of record, and assess the costs of this suit against the defendants.

---

This cause coming on to be heard on the joint motion of the parties for a final decree herein, and the court having considered the report of the special master heretofore filed herein and being advised in the premises, it is, upon consideration, ordered, adjudged and decreed that—

The equities of this cause are with the plaintiff, she is entitled to maintain this suit, and the court has jurisdiction of the subject matter and the parties hereto.

The report of the special master filed herein and conclusions of law stated therein are, each and every, ratified, approved and confirmed, and the special master is allowed the sum of $650 for the taking of testimony herein and the making of said report.

Plaintiff has sustained the allegations in her complaint and is entitled to the relief for which she prayed, with the exception of attorney fees.

Defendants have violated the provisions of section 687.07, Florida Statutes 1953, and are liable for the penalties therein prescribed.

The promissory note, dated March 29, 1954, in the principal amount of $4,000, executed by the plaintiff and payable to the defendants is hereby canceled and held for naught.

The mortgage dated March 29, 1954 executed by the plaintiff to the defendants and recorded in the official records of Broward County, Florida, in book 128 at pages 56, 57 and 58 is hereby canceled and held for naught, and the clerk of the court shall place a notation upon the margin of said record noting said cancelation and referring to this decree.

The defendants shall pay the costs of this suit hereby taxed at $113.35 in addition to the above mentioned special master's fee. Let execution issue for the total costs of $763.35.